BR

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | I N D I C T M E N T |
| | ) | (UNDER SEAL) |
| HARRY DEAN CANADY | ) | |
| | ) | |

THE GRAND JURY CHARGES:

## COUNT ONE
*(conspiracy to commit offenses
against the United States,
in violation of 18 U.S.C. § 371)*

### INTRODUCTORY STATEMENT

1.    HARRY DEAN CANADY, defendant herein, and others worked together to defraud the United States of America through the filing of false insurance claims and false crop disaster relief claims ultimately reimbursed by the United States Department of Agriculture, and to make material false statements in connection with the Federal Crop Insurance program. The false statements were then sent by mail or wire.

### STATUTORY AND REGULATORY BACKGROUND

2.    In 1938, Congress passed the Federal Crop Insurance Act (hereinafter referred to as the "Act"), 7 U.S.C. § 1501 et seq., in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

3.    In furtherance of this purpose, Congress established the

Federal Crop Insurance Corporation (hereinafter referred to as "FCIC"), 7 U.S.C. § 1503, which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of United States Department of Agriculture (hereinafter referred to as "USDA"). 7 U.S.C. § 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

4. The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with an insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such unavoidable events caused the harvest for the farm to be less than the amount specified in the insurance contract, or written policy agreement. The insurance contract or written policy agreement, and premiums of coverage, are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN").

5. By delegated authority, the Secretary of USDA issued regulations governing the federal crop insurance program. 7 C.F.R. § 400 et seq.

6. Since 2004, farmers have been required to take out insurance policies prior to the growing season. Farmers generally

-2-

do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his yield (*i.e.*, the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his crop insurance policy, then the insurance premium is typically deducted from the amount paid out to farmer under the policy.

7. Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold, and the cause of loss.

8. Under the crop insurance program, the insurance coverage available, also known as the guarantee, is based upon the farmer's actual production history for the crop *if* the farmer has produced that crop on that farm during each of the 4 years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced the crop for more than 4 years, the guarantee will be based upon production history of those preceding years but no more than 10 years of production history will be used. 7 U.S.C. § 1508.

9. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52.

10. Because new producers by definition do not have an actual production history, new producers are assigned a production yield by the Secretary, as delegated to the FCIC. 7 U.S.C. § 1508. New

-3-

producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6).

11. The regulations exclude from the definition of new producer any entity which includes individuals with more than two years of actual production history. 7 C.F.R. § 400.52.

12. As statutorily mandated, the Secretary of USDA established the Risk Management Agency (hereinafter referred to as "RMA"), an agency of the USDA, to supervise the FCIC and to administer all programs authorized under the Act. 7 U.S.C. § 6933.

13. By 1986, most crop insurance was sold through private insurance companies contracting with RMA. USDA reimbursed the private insurance companies for any claims paid in connection with crop losses covered by the federal crop insurance program.

14. In order to qualify for federal crop insurance, a producer must have a bona fide insurable interest in a crop as an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. The term does not include an organization that does not grow crops but merely receives them from producers for handling.

15. The U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (Pub. L. 110-28), as amended, authorized the Secretary to provide disaster assistance to producers who suffered crop losses because of adverse weather conditions in 2005, 2006, and 2007. Regulations govern the

-4-

Crop Disaster Program (hereinafter referred to as "CDP"). See 7
C.F.R. § 760 et. seq.

16. The Farm Service Agency (hereinafter referred to as
"FSA") administered the 2005-2007 CDP. 7 C.F.R. § 760.801. CDP
provided assistance for FCIC insurable crops including flue-cured
tobacco, wheat, corn, and soybeans. 7 C.F.R. § 760.802. A
participant on a farm is eligible for assistance under this section
with respect to losses to an insurance commodity if the participant
obtained a policy or plan of insurance under the Federal Crop
Insurance Act for the crop incurring the losses. 7 C.F.R. §
760.806(a)(1). Where available and determined accurate by FSA, RMA
loss records are used for insured crops in evaluating applications
for CDP benefits. 7 C.F.R. § 760.812. The 2005, 2006, and 2007,
CDP application had to be submitted on a completed FSA-840, or such
other form designated for such application by FSA, in the FSA
county office in the participant's control county office before the
close of business on a specified date. 7 C.F.R. § 760.804(a). The
participant applying for benefits under the CDP must certify the
accuracy and truthfulness of the information provided in the
application as well as any documentation filed with or in support
of the application. 7 C.F.R. § 760.804(c).

-5-

## FACTUAL BACKGROUND

At all times relevant hereto,

17.   HARRY DEAN CANADY was a resident of Lumberton, North Carolina.

18.   HARRY DEAN CANADY also owned and rented farmland in Robeson County, North Carolina, and produced, among other crops, tobacco, corn, wheat, and soybeans. As such, HARRY DEAN CANADY had an insurable interest in his tobacco, corn, wheat, and soybean crops.

19.   MC Farms Co., Inc. (hereinafter referred to as "MC Farms") was a North Carolina corporation, established in February 2008, for the purpose of farming. HARRY DEAN CANADY was the Vice-President of MC Farms, and part of his farm lands were placed within the corporation. Although the company was not incorporated until 2008, HARRY DEAN CANADY used MC Farms beginning in 2007.

20.   HARRY DEAN CANADY managed all of the day-to-day farming operations of MC Farms. HARRY DEAN CANADY also owned all of the crops, raised the agricultural crops, and put the crops in a condition for the market. HARRY DEAN CANADY retained all of the risk of production.

21.   The Hallmart Agency, Inc. was a North Carolina corporation, established in September 1990, for the purpose of selling insurance, including multi-peril crop insurance policies for, among other crops, tobacco, soybean, corn, and wheat, and in

-6-

fact, sold crop insurance policies for such agricultural commodities. The Hallmart Agency, Inc.'s principal place of business was located at 3621 Airport Boulevard, Wilson, North Carolina. The Hallmart Agency, Inc. also secured a license to operate a check-cashing business. The check-cashing business was operated from the same business location as the insurance agency. The Hallmart Agency, Inc. was dissolved, effective October 2007.

22. Gilman Insurance Services, Inc. was a North Carolina corporation, established in August 2007, for the purpose of selling insurance, including multi-peril crop insurance policies for, among other crops, tobacco, soybean, corn, and wheat, and in fact, sold crop insurance policies for such agricultural commodities. Gilman Insurance Services, Inc.'s principal place of business was located at 3904 Airport Drive NW # A, Wilson, North Carolina.

23. Rural Community Insurance Services (hereinafter referred to as "RCIS") was a subsidiary of the Rural Community Insurance Company of Anoka, Minnesota, engaged in, among other things, the business of providing crop insurance services to the agriculture community. RCIS contracted with the RMA to provide federally-backed multi-peril crop insurance policies. RCIS executed a Standard Reinsurance Agreement with RMA.

24. RCIS contracted The Hallmart Agency, Inc. and Gilman Insurance Services, Inc., to act as a local independent insurance agents for multi-peril crop insurance policies.

-7-

25. Phillip Morris U.S.A. is an operating company of Altria Group Inc, a Virginia corporation, established for the purpose, among other things, of purchasing flue-cured tobacco from sources for processing and production of tobacco products.

26. K-Kelly Tobacco Warehouse Inc. was a North Carolina corporation, established in 1998, for the purpose of buying and selling flue-cured tobacco. K-Kelly Tobacco Warehouse, Inc. also did business under the business name of Liberty Tobacco Brokers.

27. Liberty Warehouse is a tobacco warehouse located in Wilson County, North Carolina, which accepts tobacco for purchase and re-sale.

28. Cape Fear Farm Credit is part the Farm Credit System which was established by Congress in 1916 and which is a nationwide network of borrower-owned lending institutions. The Farm Credit Administration, an agency of the federal government, oversees the Farm Credit System.

29. The Federal Crop Insurance Corporation (hereinafter referred to as "FCIC") was a government-owned corporation, within the United States Department of Agriculture (hereinafter referred to as "USDA"), a department of the executive branch of the United States.

30. The FCIC operated through the Risk Management Agency, (RMA), which was also an agency of the USDA.

31. The FSA was an agency within USDA.

-8-

32. During the 2006 crop year, HARRY DEAN CANADY had federal crop insurance through The Hallmart Agency, Inc., who acted as the local agent for RCIS.

33. During the 2007, 2008, 2009, and 2010 crop years, HARRY DEAN CANADY had federal crop insurance through Gilman Insurance Services, Inc., who acted as the local agent for RCIS.

## THE CONSPIRACY

34. Beginning in or about August 2006, the exact date being unknown, and continuing up to and including on or about December 31, 2009, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did combine, conspire, confederate and agree with other persons known and unknown to the grand jury to commit offenses against the United States, to wit:

a. to knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, in violation of Title 18, United States Code, Section 1014;

b. in a matter within the jurisdiction of the Federal Crop Insurance Corporation, an agency within the United States Department of Agriculture, a department of the executive branch of the United States, in connection with the Federal Crop Insurance Program, to knowingly and willfully: (i) falsify, conceal, and cover up by any trick, scheme and devise, a material fact; and (ii) make materially false, fictitious, and fraudulent statements and presentations; and (iii) make and

-9-

use any false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements, in violation of Title 18, United States Code, Section 1001;

c.    having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice and attempting to do so, to place in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service, and to knowingly cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of Title 18, United States Code, Section 1341; and

d.    having devised and intending to devise any scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire in interstate commerce, that is, by electronic mail and facsimile, writings, signals and sounds, in violation of Title 18, United States Code, Section 1343.

### PURPOSE OF THE CONSPIRACY

35.    It was the purpose of the conspiracy to profit through the filing of false and fictitious insurance claims, the sale of unreported tobacco and unreported grain, to hide the criminal proceeds through payments in nominee names, and to obtain a more favorable insurance guarantee.

-10-

## MANNER AND MEANS

36. In furtherance of the conspiracy, HARRY DEAN CANADY, defendant herein, along with others, employed the following manner and means:

a. HARRY DEAN CANADY, on behalf of his farming operations, and other co-conspiring farmers obtained or caused to be obtained federal crop insurance policies for their tobacco and grain crops.

b. HARRY DEAN CANADY and other co-conspiring farmers then filed false crop insurance claims, and hid some or all of their tobacco and/or grain production by selling it in nominee names or for cash to a co-conspiring tobacco warehouseman and grain dealers.

c. HARRY DEAN CANADY and the other co-conspiring farmers profited under the scheme because they were paid twice for each pound of tobacco or bushel of grain: once through the false crop insurance claim, and also through the sale of the unreported ("hidden") tobacco and/or grain.

d. Other co-conspirators profited through other aspects of the double sales scheme, including the original insurance commission, collecting a share of the hidden tobacco's second sale, and profit margins derived from subsequent sales to larger tobacco companies.

-11-

e.     The co-conspiring tobacco warehouses and grain dealers then paid the co-conspiring farmers, including HARRY DEAN CANADY with checks made payable in false or nominee names.

f.     HARRY DEAN CANADY and other co-conspiring farmers who sold the unreported ("hidden") tobacco and/or unreported ("hidden") grain misrepresented the truth of farm operations in a variety of documents that were submitted to the private insurance entities. For example, documents, including applications, reports of actual production history, acreage reports, and claim forms made and submitted in support of crop insurance coverage and claims, failed to truthfully show who had an insurable interest and who really suffered a loss and the extent of that loss.

g.     In some instances, the conspirators, including HARRY DEAN CANADY, falsely allocated loss and harvest amounts on Production and Yield Reporting Forms and Production Worksheet reports. That is, to fraudulently establish losses on some insured farms, the co-conspirators engaged in a practice of "yield shifting" that is, falsely reporting that the farmer had harvested very small quantities from the insured farm for which a claim was being filed and falsely reporting much larger production per acre from other farms or other entities.

h.     A co-conspirator would either mail or caused to be mailed, through the U.S. mail, the insurance claim forms, or would submit the claim forms by electronic mail.

-12-

i.    Co-conspiring farmers received payment on the claims through their insurance company and/or insurance agency which would be reimbursed for the payments by USDA.

j.    In an effort to increase guarantees under the federal crop insurance program, HARRY DEAN CANADY caused another person to create a new corporation, MC Farms Co., Inc.. HARRY DEAN CANADY was, in fact, the producer for MC Farms Co., Inc., and both owned and farmed all of the crops. By so creating the new corporation, however, HARRY DEAN CANADY was able to obtain a "new producer" guarantee.

## OVERT ACTS

37.    In furtherance of the conspiracy, and to effect the object thereof, there were committed by at least one of the co-conspirators in the Eastern District of North Carolina at least one of the following overt acts, among others:

### PRODUCER HARRY CANADY FRAUD SCHEME

#### 2006 Wheat Crop

a.    On July 20, 2006, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross wheat sales in the amount of 8,426 bushels.

b.    On or about July 21, 2006, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $29,385 which was reimbursed by RMA.

-13-

## 2006 Tobacco Crop

c. On or about September 11, 2006, HARRY DEAN CANADY and other co-conspirators arranged for the sale of 11,720 pounds of hidden tobacco to Liberty Tobacco Brokers in Wilson, North Carolina.

d. On or about September 15, 2006, a co-conspirator at Liberty Tobacco Brokers caused to be issued a check in the false payee name of "Joe Martinez" for 5,228 pounds of the hidden tobacco.

e. On or about September 19, 2006, a co-conspirator cashed the check issued by Liberty Tobacco Brokers through The Hallmart Agency, Inc.. Monies from the sale were subsequently delivered to HARRY DEAN CANADY.

f. On or about September 15, 2006, a co-conspirator at Liberty Tobacco Brokers caused to be issued a check in the false payee name of "Randy Fulford" for 6,492 pounds of the hidden tobacco.

g. On or about September 15, 2006, a co-conspirator cashed the check issued by Liberty Tobacco Brokers through The Hallmart Agency, Inc.. Monies from the sale were subsequently delivered to HARRY DEAN CANADY.

h. On October 26, 2006, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross tobacco sales in the amount of 32,740 pounds.

i. On or about October 27, 2006, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $80,756 which was reimbursed by RMA.

## 2006 Corn Crop

j. On November 10, 2006, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross corn sales in the amount of 19,997.90 bushels.

k. On or about November 13, 2006, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $32,468.00 which was reimbursed by RMA.

## 2006 Soybean Crop

l. On February 2, 2007, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross soybean sales in the amount of 12,591 bushels.

m. On or about February 5, 2007, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $64,382.00 which was reimbursed by RMA.

## 2007 Wheat Crop

n. On July 26, 2007, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross wheat sales in the amount of 8,718 bushels.

o. On or about July 27, 2007, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $49,452.00 which was reimbursed by RMA.

### 2007 Corn Crop

p. On October 12, 2007, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross corn sales in the amount of 8,941.30 bushels.

q. In 2007, HARRY DEAN CANADY sold and caused to be sold in another person's name an additional 23,730 bushels of corn.

r. On or about October 16, 2007, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $78,156.00 which was reimbursed by RMA.

### 2007 Soybean Crop

s. On January 21, 2008, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross soybean sales in the amount of 7,192 bushels.

t. In 2008, HARRY DEAN CANADY sold and caused to be sold in other persons' names an additional 2261.3 bushels of soybeans.

u. On or about January 22, 2008, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $99,537.00 which was reimbursed by RMA.

### 2008 Soybean Crop

v. On or about January 9, 2009, and April 15, 2009, HARRY DEAN CANADY and another co-conspirator submitted and caused to be submitted false Production and Yield Reporting Forms for himself and MC Farms; that is, HARRY DEAN CANADY and his co-

-16-

conspirator shifted and caused to be shifted yield production between farms in his name, and between the farms in his name and the farms in MC Farms' name.

w.    On February 3, 2009, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross soybean sales in the amount of 6,350.30 bushels, knowing that his total sales for the year were at least 9,112 bushels.

x.    On or about February 9, 2009, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $60,140.00 which was reimbursed by RMA.

## "NEW PRODUCER" FRAUD SCHEME

### 2007 Crop Year

y.    On or about February 8, 2007, HARRY DEAN CANADY caused to be submitted a 2007 Multi-Peril Crop Insurance Application form on behalf of MC Farms, that falsely represented his daughter with initials "M.C." to be the 100% shareholder of MC Farms, and failed to disclose his interest and participation in the company in order to secure a new producer guarantee for MC Farms.

### 2007 Tobacco Crop

z.    On November 9, 2007, on behalf of MC Farms, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross tobacco sales in the amount of 142,780 pounds.

-17-

aa. On or about November 14, 2007, on behalf of MC Farms, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $102,983 which was reimbursed by RMA.

### 2008 Crop Year

bb. On or about February 11, 2008, HARRY DEAN CANADY caused to be submitted a 2008 Multi-Peril Crop Insurance Application form on behalf of MC Farms, that falsely represented "M.C." to be the 100% shareholder of MC Farms.

### 2008 Tobacco Crop

cc. On November 11, 2008, on behalf of MC Farms, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross tobacco sales in the amount of 145,106 pounds.

dd. On or about November 13, 2008, on behalf of MC Farms, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $180,996 which was reimbursed by RMA.

### 2008 Corn Crop

ee. On December 18, 2008, on behalf of MC Farms, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross corn sales in the amount of 18,419 bushels.

ff. HARRY DEAN CANADY failed to report his total corn production to RMA sold under his name and MC Farms.

-18-

gg. HARRY DEAN CANADY submitted and caused to be submitted false Production and Yield Reporting Forms for himself and MC Farms.

hh. On or about January 1, 2009, on behalf of MC Farms, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $96,249 which was reimbursed by RMA.

### 2009 Crop Year

ii. On or about January 15, 2009, HARRY DEAN CANADY caused to be submitted a 2009 Multi-Peril Crop Insurance Application form on behalf of MC Farms, that falsely represented "M.C." to be the 100% shareholder of MC Farms.

### 2009 Corn Crop

jj. On November 16, 2009, on behalf of MC Farms, HARRY DEAN CANADY submitted and caused to be submitted a crop insurance claim reporting gross corn sales in the amount of 5,294 bushels.

kk. HARRY DEAN CANADY failed to accurately report his corn production to RMA sold under his name and MC Farms.

ll. On or about November 17, 2009, on behalf of MC Farms, HARRY DEAN CANADY caused to be paid an insurance indemnity payment in the total amount of $41,867 which was reimbursed by RMA.

### Other Overt Acts

mm. On or about May 22, 2007 HARRY DEAN CANADY denied to law enforcement agents that he sold tobacco with an agent with

-19-

initials "R.C.S.", when HARRY DEAN CANADY knew then and there that he had in fact sold tobacco with "R.C.S.".

nn. On or about June 25, 2008, HARRY DEAN CANADY told law enforcement agents that he had no involvement in the MC Farm operations.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO
*(false statements in connection with
federal crop insurance for 2006 tobacco crop,
in violation of 18 U.S.C. § 1014)*

1. Paragraphs 1-14, 17-18, 21, 23-30, 32, and 37(c)-37(i) in Count One above are re-alleged and incorporated herein by reference.

2. On or about October 27, 2006, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, to wit: HARRY DEAN CANADY caused to be submitted a claim for indemnity in which he only reported his tobacco sales to Phillip Morris U.S.A., knowing that those sales did not reflect his true tobacco crop production

-20-

for the year, which resulted in an indemnity payment of $80,756.00, all in violation of Title 18, United States Code, Section 1014.

### COUNT THREE
*(material false statements in connection with
federal crop disaster relief for 2006 crop year,
in violation of 18 U.S.C. § 1001)*

1.     Paragraphs 1-18 in Count One above are re-alleged and incorporated herein by reference.

2.     On or about October 24, 2007, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, in a matter within the jurisdiction of the Farm Service Agency, an agency within the United States Department of Agriculture, a department of the executive branch of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations; that is, HARRY DEAN CANADY provided production data he knew to be false in connection with an application for disaster payments and that false production data caused him to receive monies to which he was not entitled, all in violation of Title 18, United States Code, Section 1001.

-21-

## COUNTS FOUR AND FIVE
*(false statements in connection with*
*federal crop insurance for 2006 and 2007 wheat crop,*
*in violation of 18 U.S.C. § 1014)*

1.  Paragraphs 1-14, 17-18, 21, 23-24, 28-30, 32, 37(a)-37(b), and 37(n)-37(o) in Count One above are re-alleged and incorporated herein by reference.

2.  On or about each of the dates specified below, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, to wit: HARRY DEAN CANADY caused to be submitted a claim for indemnity in which he failed to disclose his full wheat crop production for the year, knowing that he in fact produced, harvested, and sold more of the crop than so declared, as outlined below:

| Count | Date of False Statement | Amount of Crop Production Falsely Declared | Indemnity Paid on False Claim |
|-------|-------------------------|--------------------------------------------|-------------------------------|
| Four  | July 20, 2006           | 8,426 bushels                              | $29,385                       |
| Five  | July 26, 2007           | 8,718 bushels                              | $49,452                       |

-22-

Each false statement in the above table constituting a separate violation of Title 18, United States Code, Section 1014.

## COUNTS SIX AND SEVEN
*(false statements in connection with federal crop insurance for 2006 and 2007 corn crop, in violation of 18 U.S.C. § 1014)*

1. Paragraphs 1-14, 17-18, 21-24, 28-30, 32-33, 37(j)-37(k), and 37(p)-37(r) in Count One above are re-alleged and incorporated herein by reference.

2. On or about each of the dates specified below, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, to wit: HARRY DEAN CANADY caused to be submitted a claim for indemnity in which he failed to disclose his full corn crop production for the year, knowing that he in fact produced, harvested, and sold more of the crop than so declared, as outlined below:

| Count | Date of False Statement | Amount of Crop Production Falsely Declared | Indemnity Paid on False Claim |
|-------|------------------------|--------------------------------------------|-------------------------------|
| Six   | November 10, 2006      | 19,997 bushels                             | $32,468                       |
| Seven | October 12, 2007       | 8,941 bushels                              | $78,156                       |

Each false statement in the above table constituting a separate violation of Title 18, United States Code, Section 1014.

## COUNTS EIGHT, NINE AND TEN
*(false statements in connection with federal crop insurance for 2006, 2007, and 2008 soybean crop, in violation of 18 U.S.C. § 1014)*

1. Paragraphs 1-14, 17-18, 21-24, 28-30, 32-33, 37(l)-37(m), and 37(s)-37(x) in Count One above are re-alleged and incorporated herein by reference.

2. On or about each of the dates specified below, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, to wit: HARRY DEAN CANADY caused to be submitted a claim for indemnity in which he failed to disclose his full soybean crop production for

-24-

the year, knowing that he in fact produced, harvested, and sold more of the crop than so declared, as outlined below:

| Count | Date of False Statement | Amount of Crop Production Falsely Declared | Indemnity Paid on False Claim |
|-------|------------------------|--------------------------------------------|-------------------------------|
| Eight | February 2, 2007 | 12,591.3 bushels | $64,382 |
| Nine | January 21, 2008 | 7,192 bushels | $99,537 |
| Ten | February 3, 2009 | 6,350.30 bushels | $60,140 |

Each false statement in the above table constituting a separate violation of Title 18, United States Code, Section 1014.

### COUNT ELEVEN
*(aggravated identity theft and aiding and abetting in violation of 18 U.S.C. §§ 1028A and 2)*

On or about September 27, 2007, in the Eastern District of North Carolina, HARRY DEAN CANADY, defendant herein, did knowingly use, without lawful authority, a means of identification of another person, to wit, the name of his grandchild with initials "A.G.", during and in relation to false statements to the Federal Crop Insurance Corporation and any company the FCIC reinsures, as charged in Count Seven above, and did aid and abet another in so doing, all in violation of Title 18, United States Code, Sections 1028A and 2.

-25-

## COUNT TWELVE
*(aggravated identity theft*
*in violation of 18 U.S.C. § 1028A)*

On or about January 3, 2008, in the Eastern District of North Carolina, HARRY DEAN CANADY, defendant herein, did knowingly use, without lawful authority, a means of identification of another person, to wit, the name of his grandchild with initials "M.C.", during and in relation to false statements to the Federal Crop Insurance Corporation and any company the FCIC reinsures as charged in Count Nine above, all in violation of Title 18, United States Code, Section 1028A.

## COUNTS THIRTEEN, FOURTEEN, and FIFTEEN
*(false statements in connection with federal*
*crop insurance for 2007, 2008, and 2009 Application for*
*Federal Crop Insurance for MC Farms, and aiding and abetting,*
*in violation of 18 U.S.C. §§ 1014 and 2)*

1.    Paragraphs 1-14, 17-25, 28-30, 32-33, 37(y), 37(bb), and 37(ii) in Count One above are re-alleged and incorporated herein by reference.

2.    On or about each of the dates specified below, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly make false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, insurance agreement, application for insurance and a guarantee, and any change or extension of any of the same, by renewal, deferment of action and otherwise, and did

-26-

aid and abet another in so doing, to wit: HARRY DEAN CANADY caused
to be submitted a Multi-Peril Crop Insurance Application form on
behalf of MC Farms, that falsely represented his daughter with
initials "M.C." to be the 100% shareholder of MC Farms when, in
fact, he was responsible for all of the farming related activities
of MC Farms, and he represented to others, including a Cape Fear
Farm Credit representative, that he was the owner of the
corporation, as outlined below:

| Count    | Date of Offense   |
|----------|-------------------|
| Thirteen | February 8, 2007  |
| Fourteen | February 11, 2008 |
| Fifteen  | January 15, 2009  |

Each false statement in the above table constituting a
separate violation of Title 18, United States Code, Sections 1014
and 2.

#### COUNT SIXTEEN
*(money laundering and aiding and abetting*
*in violation of 18 U.S.C. §§ 1957 and 2)*

On or about October 3, 2007, in the Eastern District of North
Carolina, and elsewhere, HARRY DEAN CANADY, defendant herein, did
knowingly engage and attempt to engage in the following monetary
transactions by, through, and to a financial institution, affecting
interstate or foreign commerce, in criminally derived property of
a value greater than $10,000, that is, the deposit and withdrawal
of U.S. currency, funds, monetary instruments, such property having

-27-

been derived from a specified unlawful activity, that is, aggravated identity theft in violation of Title 18, United States Code, Section 1028A, and did aid and abet another in so doing. Specifically, HARRY DEAN CANADY directed another person known to the Grand Jury to deposit into a financial institution a check in the amount of $84,655.97 of which, $84,000 was transferred within one week of such deposit from account number XXXX2756 to account number XXXX5322 at Lumbee Guaranty Bank, an account controlled by HARRY DEAN CANADY, all in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS SEVENTEEN THROUGH TWENTY-TWO
*(money laundering and aiding and abetting*
*in violation of 18 U.S.C. §§ 1957 and 2)*

On or about the dates set forth below, in the Eastern District of North Carolina, and elsewhere, HARRY DEAN CANADY, defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposit and withdrawal of U.S. currency, funds, monetary instruments, such property having been derived from a specified unlawful activity, that is, false statements in connection with the federal crop insurance program in violation of Title 18, United States Code, Section 1014, and did aid and abet another in so doing, as outlined below:

-28-

| Count | Date of Offense | Monetary Transaction |
|-------|-----------------|----------------------|
| Seventeen | August 20, 2007 | $25,089.73 check written against account number XXXX5322 at Lumbee Guaranty Bank, made payable to a farm chemical company |
| Eighteen | January 4, 2008 | $85,000.00 check written against account number XXXX1963 at Lumbee Guaranty Bank, made payable to Cape Fear Farm Credit |
| Nineteen | February 5, 2008 | $77,559.34 check written against account number XXXX5322 at Lumbee Guaranty Bank, payable to an oil company |
| Twenty | December 22,2008 | $150,360.00 indemnity check from Rural Community Service, endorsed as payable to Cape Fear Farm Credit, deposited, and applied to a loan in the name of HARRY DEAN CANADY |
| Twenty-One | January 9, 2009 | $49,823.45 check written against account number XXXX1963 at Lumbee Guaranty Bank, payable to Cape Fear Farm Credit |
| Twenty-Two | January 13, 2009 | $45,000.00 check written against account number XXXX1963 at Lumbee Guaranty Bank immediately transferred into account number XXXX5322 at Lumbee Guaranty Bank |

Each entry in the above table constituting a violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT TWENTY-THREE
*(retaliating against a federal official*
*in violation of 18 U.S.C. § 115)*

On or about June 25, 2008, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did threaten to assault and murder a federal law enforcement officer, with intent to impede, intimidate, and interfere with such law enforcement officer while engaged in the performance of official duties, all in violation of Title 18, United States Code, Section 115.

## COUNT TWENTY-FOUR
*(felon in unlawful possession of firearms*
*and ammunition in violation of*
*18 U.S.C. § 922(g))*

On or about November 22, 2010, in the Eastern District of North Carolina, defendant HARRY DEAN CANADY, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce firearms and ammunition, all in violation of Title 18, United States Code, Sections 922(g)(1) and 924.

## COUNT TWENTY-FIVE
*(retaliating against a federal official*
*in violation of 18 U.S.C. § 115)*

On or about January 23, 2012, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did threaten to assault and murder a federal law enforcement officer, with intent to retaliate against such law enforcement

-30-

officer on account of the performance of official duties, all in violation of Title 18, United States Code, Section 115.

## COUNT TWENTY-SIX
*(retaliating against a federal official in violation of 18 U.S.C. § 115)*

On or about February 21, 2012, within the Eastern District of North Carolina and elsewhere, HARRY DEAN CANADY, defendant herein, did threaten to assault and murder a federal law enforcement officer, with intent to retaliate against such law enforcement officer on account of the performance of official duties, all in violation of Title 18, United States Code, Section 115.

(SPACE LEFT BLANK INTENTIONALLY)

-31-

## FORFEITURE NOTICE AND FINDING OF PROBABLE CAUSE

The defendant is given notice of the provisions of 18 U.S.C. §§ 924(d)(1), 981(a)(1)(C), and 982(a)(1) & (a)(2)(A) that all of his interest in all property specified herein is subject to forfeiture.

As a result of the foregoing offenses as alleged in Counts One, Two, Four through Ten, and Thirteen through Fifteen of this Indictment, the defendant shall forfeit to the United States any and all property constituting, or derived from, any proceeds the said defendant obtained directly or indirectly as a result of the said offenses.

Furthermore, as a result of the foregoing offenses as alleged in Counts Sixteen through Twenty-Two of this Indictment, the defendant shall forfeit to the United States all property involved in such offenses.

Finally, as a result of the foregoing offense contained in Count Twenty-Four of this Indictment, the defendant shall forfeit to the United States all firearms and ammunition involved in or used in the offense.

The forfeitable property includes, but is not limited to:

(1) personal property; including but not limited to, the following firearms and ammunition:

> H & R, .32 caliber revolver;
> Remington, Model 12 gauge shotgun;

Marlin, Model 60, .22 caliber rifle;

Browning Arms, Model Twelvette, 12 gauge shotgun;

Beretta, .25 caliber semiautomatic pistol;

Rossi, .38 caliber revolver, Model 68;

Six (6) rounds of live .32 caliber R/P ammunition;

Thirty-four (34) live .32 caliber R/P ammunition;

One hundred five (105) live .22 caliber Remington Thunderbolts rounds;

Five (5) live rounds Dominion .38 caliber ammunition; and

Forty-three (43) rounds of live .38 caliber ammunition;

and the following farm equipment:

2004 Case III 2366 Axle Flow Combine, Serial Number JJCO257478; and

2006 Case IH 1020 Grain Head, Serial Number CBJ023088;

(2) real property, including the following:

| County | Book | Page | Property Address | City | State |
|--------|------|------|------------------|------|-------|
| Robeson | 1089 | 199 | 1042 Piney Grove Rd | Lumberton | NC |
| Robeson | 1602 | 747 | 4289 Rennert Rd | Lumberton | NC |
| Robeson | 1311 | 435 | Rozier Church Rd | Lumberton | NC |
| Robeson | 1417 | 279 | Rozier Church Rd | Lumberton | NC |
| Robeson | 1527 | 67 | Rozier Church Rd | Lumberton | NC |
| Robeson | 1125 | 1 | McDuffie Crossing Rd | Lumberton | NC |
| Robeson | 1142 | 583 | 894 Mt Olive Church Rd | Lumberton | NC |
| Robeson | 610 | 556 | 9849 US Highway 301 N | Lumberton | NC |
| Robeson | 1808 | 184 | 9849 US Highway 301 N | Lumberton | NC |

| Robeson | 947 464 | Brandons Rd | Lumberton | NC |
| Robeson | 1304 818 | 124 Nestle Drive | Lumberton | NC |
| Robeson | 957 301 | 124 Nestle Drive | Lumberton | NC |
| Robeson | 1471 506 | 815 Mt. Olive Church Rd | Lumberton | NC |
| Horry | 3169 81 | Carolina Yacht Landing Unit X-14 HPR | Little River | SC |
| Robeson | 1708 917 | 176 Rozier Church Rd | Lumberton | NC |

and

(3) currency in the amount of **$1,036,516.00**, representing the gross proceeds of offenses stated in this Indictment.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property, including but not limited to the following bank and retirement accounts:

(1) Account No. XXXX5322 at Lumbee Guarantee Bank in the name of Harry D. Canady;

-34-

(2) Account No. XXXX5393 at Lumbee Guarantee Bank in the name of Harry D. Canady

(3) Account No. XXXX2573 at First Bank in the name of Harry D. Canady, "S.C.", and "M.C.;"

(4) Account No. XXXX9492 at First Bank in the name of Harry D. Canady, "S.C.", and "M.C.;"

(5) Account No. XXXX9689 at First Bank in the name of Harry D. Canady and "M.C.;"

(6) Account No. XXXXXXX146-7 at Wells Fargo in the name of Harry D. Canady;

(7) Account No. XXXXXXX1146 at Wells Fargo in the name of Harry D. Canady;

all rental proceeds, including but not limited to payments received or to be received from the Lumberton Housing Authority on account number XXXX26.S8 and paid to Harry D. Canady; and

any and all patronage payments from Cape Fear Farm Credit ACA.

All in accordance with 18 U.S.C. §§ 981 and 982.

The Grand Jury finds probable cause to believe that the property described herein and for the reasons stated herein is subject to forfeiture in accordance with 18 U.S.C. §§ 981 and 982.

A TRUE BILL:

_____
FOREPERSON

THOMAS G. WALKER
United States Attorney

BY: BANUMATHI RANGARAJAN
Assistant United States Attorney
Criminal Division

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

-35-