UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
                        SOUTHERN DIVISION

UNITED STATES OF AMERICA,        :     Docket No. 7:12-CR-00079-D

     Plaintiff,                  :     Raleigh, North Carolina
                                       Monday, June 25, 2012
          v.                     :     12:53 a.m.

HARRY DEAN CANADY,               :

     Defendant.                  :

: : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

                  TRANSCRIPT OF DETENTION HEARING
              BEFORE THE HONORABLE JAMES E. GATES,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States        United States Attorney's Office
of America:                  BY:  BANU RANGARAJAN, AUSA
                             310 New Bern Avenue, Suite 800
                             Raleigh, North Carolina  27601

For the Defendant:           Stark Law Group, PLLC
                             BY:  SETH A. NEYHART, ESQ.
                             6011 Farrington Road, Suite 300
                             Chapel Hill, North Carolina 27517


Audio Operator:              COURT PERSONNEL


Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                             1133 Tanager Trail
                             Virginia Beach, Virginia  23451
                             (757) 422-9089


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1                              INDEX

2

3                          Direct    Cross    Redirect    Recross
   WITNESSES FOR THE
4    GOVERNMENT:
   Miles Davis               3        27        39          41
5

6
   WITNESSES FOR THE
7    DEFENSE:
   Margaret Canady          47        50        55
8

9

10
   EXHIBITS:                               Marked      Received
11
       US-6      1/3/12 Cape Fear Farm Credit
12                   balance sheet               21          44

13
   ARGUMENT:      Ms. Rangarajan                              56
14
                  Mr. Neyhart                                 63
15
   REBUTTAL:      Ms. Rangarajan                              68
16

17 THE COURT:      Finding                                    71

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2          (Call to Order of the Court)

3              THE COURT:  The next case before the Court is that of

4     United States versus Harry Dean Canady.  This matter is before

5     the Court for a detention hearing.  I do not believe this is a

6     presumption case based on the charges against Mr. Canady.

7              So, Ms. Rangarajan, I'll be happy to hear any evidence

8     the Government cares to offer.

9              MS. RANGARAJAN:  Thank you, Your Honor.

10             Your Honor, the Government calls Special Agent Miles

11    Davis.

12             MILES DAVIS, GOVERNMENT'S WITNESS, SWORN

13             THE COURTROOM DEPUTY:  Thank you.  Have a seat.  And

14    please state your name for the record.

15             THE WITNESS:  Miles Brennan Davis.

16                         DIRECT EXAMINATION

17    BY MS. RANGARAJAN:

18    Q    Good afternoon, sir.

19         Would you please tell the Court how you're currently

20    employed?

21    A    I am a special agent with the United States Department of

22    Agriculture-Office of Inspector General Investigations, out of

23    Raleigh, North Carolina.

24    Q    And how long have you been an agent with USDA-OIG?

25    A    Since June of 2008.

1  Q   Prior to that, what did you do?

2  A   From 1988 to the, to June of '08, I was employed by the

3  United States Department of Agriculture-Farm Service Agency in

4  various capacities.

5  Q   As a special agent with USDA-OIG and based on your prior

6  experience with the Farm Service Agency, are you familiar with

7  the crop insurance, the federal crop insurance program?

8  A   Yes.

9  Q   Would you please briefly describe the nature of the program

10 to the Court?

11 A   Federal crop insurance is a federal program designed to

12 cover unavoidable losses for farmers who grow various crops.

13 The, the insurance program is a federal program, but it's

14 actually administered through private insurance companies

15 through what's called a standard reinsurance agreement that

16 they enter into with the Government.

17 Q   If a farmer sustains a loss, applies for coverage, who

18 ultimately is paying for that benefit?

19 A   The taxpayers.

20 Q   In terms of the federal crop insurance program, when the

21 farmer, when a farmer signs up for insurance, do they authorize

22 or is part of their insurance policy agreed to allowing agents

23 onto their property for purposes of inspecting crops and

24 evaluating records in connection with claims?

25 A   Yes.

1  Q    And that's part of the policies, correct?

2  A    Correct.

3  Q    Would you -- during the course of your employment as a

4  USDA-OIG agent, have you been involved in the investigation of

5  crop insurance fraud in the Eastern District of North Carolina?

6  A    Yes.

7  Q    During the course of that investigation, did you receive

8  information regarding the defendant, Harry Dean Canady?

9  A    Yes.

10 Q    In connection with fraud?

11 A    Yes.

12 Q    What is the nature of Harry Dean Canady's work?  What does

13 he do for a living?

14 A    Mr. Canady's a farmer in Lumberton, North Carolina.

15 Q    As a farmer in Lumberton, North Carolina, has he

16 participated in the federal crop insurance program?

17 A    Yes.

18 Q    And in connection -- have you reviewed his policies?

19 A    Yes.

20 Q    And in connection with those policies, did he agree to

21 allow agents onto his property to inspect crops and review

22 records in connection with any claim under the program?

23 A    By nature of the agreement of crop insurance and various

24 signatures, yes.

25 Q    What is the nature of the, the nature of the fraud that is

1  charged in the indictment against the defendant?

2  A   Regarding crop insurance fraud, it revolves around the, the

3  hiding or the hidden production of crop sales from the crop

4  insurance claim.  As production is hidden or not reported on a

5  claim, therefore, the claim is increased.

6  Q   In order -- when a farmer seeks benefits under the program,

7  basically files a claim, an insurance claim, he or she must

8  declare what they harvested for that crop that past --

9  A   Correct.  All production for the insured crop must, all

10  acres and production must be accounted for.

11          MR. NEYHART:  Your Honor, I would object to the

12  leading nature of that question.

13          THE COURT:  Objection overruled.

14          I'll just note for the record I've -- I've -- I think

15  it's appropriate to put this evidence, this background

16  information about the crop program -- the farm -- crop

17  insurance program on the record.  I have reviewed the

18  indictment.  I'm not trying to cut short, Ms. Rangarajan, what

19  you're doing, but I think it is in the nature of background

20  information.

21          So I am overruling the objection.

22          MS. RANGARAJAN:  Thank you, Your Honor.

23  BY MS. RANGARAJAN:

24  Q   What are the natures of the allegations as it relates to

25  the defendant's acts in connection with crop insurance

1    applications?

2    A    Selling crop production in other people's names and/or for

3    cash in order to, and not reporting that production on crop

4    insurance claims, therefore, having false crop insurance

5    claims.

6    Q    During the course of this investigation, did you examine

7    the defendant's production records and reports that he made to

8    the Government in connection with his insurance --

9    A    Yes.

10   Q    -- claims?

11   A    Yes.

12   Q    Have you also subpoenaed and reviewed records submitted by

13   the defendant to Cape Fear Farm Credit?

14   A    Yes.

15   Q    And in those documents submitted to Cape Fear Farm Credit

16   what type of information does the defendant provide regarding

17   crop production?

18   A    In both Cape Fear Farm Credit and crop insurance, acres and

19   production are reported; however, more production in several

20   years and several crops are reported by Cape, to Cape Fear Farm

21   Credit than was reported to the federal crop insurance program.

22   Q    Can you describe by way of example to the Court one

23   instance that you noticed in connection with your review of the

24   documents?

25   A    Yes.

1       In 2007, regarding a corn claim, Mr., the production

2   reported to federal crop insurance equaled approximately 18 to

3   19 bushels per acre on approximately 480 acres of corn.

4   That -- under the Cape Fear Farm Credit records, indicated an

5   average yield of 55.  The county --

6   Q    Fifty-five bushels per acre?

7   A    Fifty-five bushels per acre.  The county average that year

8   was approximately 67.  The review of various corn sales in

9   Mr. Canady's name and other, and in another name, those total

10  sales that we've, production that we found averaged 68 bushels

11  per acre for 2007 corn.

12  Q    And in terms of the sales by the defendant in other

13  people's names, what evidence do you have that supports that?

14  A    Production records obtained from various grain-buying

15  dealer, grain buyers, bank records.  We have checks in other

16  people's names that are deposited into Mr. Canady's bank

17  accounts.

18  Q    Okay.  So in connection with this one example of the 2007

19  corn crop, defendant filed a claim for indemnity, is that

20  correct?

21  A    Correct.

22  Q    And do you know approximately how much the Government paid

23  him based on his allegations of a loss that year?

24  A    My memory is it's approximately 75 to 80,000.

25  Q    And had he reported -- well -- and based upon your

 1   testimony, he reported to Cape Fear Farm Credit that he

 2   actually harvested 55 bushels per acre, not the 18.6 that he

 3   declared to the Government?

 4   A    Correct.

 5   Q    And in connection with -- had he reported that acreage,

 6   that, that harvest correctly to the Government, would he have

 7   received the 75 to $80,000 in indemnity?

 8   A    The claim would have been dramatically reduced.  I'm, I'm

 9   not confident whether it would have reduced it all the way to

10   zero, but most likely, it would have reduced it to zero.

11   Q    But he clearly obtained a benefit to which he was not

12   entitled based on the Cape Fear Farm --

13   A    Yes.

14   Q    -- records?

15   A    Yes.

16   Q    And when you looked at the crop for just the 2007 corn

17   year, you looked at the crop sold in other people's names by

18   the defendant, the production records.  That amount, was that

19   consistent with the county average?

20   A    All production produced by Mr., Mr. Canady equaled 68

21   bushels per acre.  The county average was 67.

22   Q    Not 18.6 as he declared to the United States --

23   A    Correct.

24   Q    -- through his crop insurance?

25        And did you see this pattern in connection with his crop

1  insurance for 2006, 2007, 2008, and 2009?

2  A    Yes.

3  Q    With respect to corn --

4  A    Yes.

5  Q    -- did you see that pattern?

6       How about wheat?

7  A    Yes.

8  Q    How about soybean?

9  A    Yes.

10  Q    And how about tobacco?

11  A    Yes.

12  Q    So same pattern with all of his crops during those years?

13  A    Yes.

14  Q    Now in June of 2000, June 25, 2008, during the course of

15  this investigation, did a special agent with the USDA-OIG go

16  out to the defendant's farm to inspect the crops and review

17  records in connection with the ongoing fraud case?

18  A    Yes.  Special Agent Don Doles, who is currently retired and

19  was the case agent initially, went out to visit Mr. Canady and

20  to inquire of him of the ongoing investigation.

21  Q    During the course of that -- did the -- did Special Agent

22  Doles actually make contact with the defendant during that

23  visit in June of 2008?

24  A    Yes.

25  Q    During the course of that visit, what, if any, threats did

 1   the defendant make to Special Agent Don Doles?

 2   A    Mr. --

 3           MR. NEYHART:   I'm going to object, Your Honor.   I

 4   don't think there's foundation laid for the basis of any of his

 5   knowledge of any threats.

 6           MS. RANGARAJAN:   Your Honor, hearsay's admissible at

 7   these proceedings.

 8           THE COURT:   It is admissible.   If you could just

 9   inquire as to how he knows of what might or might not have been

10   said during this visit.

11   BY MS. RANGARAJAN:

12   Q    Special Agent Davis, in preparing -- during the course of

13   this investigation from 2008 forward, have you had

14   conversations with Special Agent Doles about what took place

15   during the 2008 contact with the defendant?

16   A    Yes.

17   Q    So is the information -- is the testimony you're about to

18   present to the Court based upon your conversations with Special

19   Agent Doles?

20   A    It's based upon my conversations and the reading of his

21   Memorandum of Interview.

22   Q    Okay.   During the --

23           MS. RANGARAJAN:   Your Honor, may I proceed then?

24           THE COURT:   You may.

25   BY MS. RANGARAJAN:

1  Q    During the course of that June 25, 2008 meeting of Special

2  Agent Doles with the defendant at the defendant's property,

3  what, if any, threats did the defendant make to Special Agent

4  Doles?

5  A    Mr. Canady accused Agent Doles of harassing him and

6  trespassing onto his property and he threatened to go get his

7  gun.

8  Q    Did Special Agent Doles identify himself before that?

9  A    Yes.

10 Q    As a USDA-OIG agent, under the crop insurance policy did

11 Special Agent Doles have the authority to be on that property?

12 A    Yes.

13 Q    The defendant had consented to that, correct?

14 A    Yes.

15 Q    At a subsequent time, what, if any, admissions did the

16 defendant make to you about that incident?

17 A    In the fall of 2010, in a meeting here in this building,

18 Mr. Canady acknowledged -- I was standing there -- but he

19 acknowledged to Investigator Paul Lett (phonetic), who was also

20 with Agent Doles, admitted that he said "You're the one I

21 showed my piece to."

22 Q    What do you understand "piece" to mean?

23 A    To be a firearm.

24 Q    During the course of this investigation were there

25 consensually monitored phone recordings with the defendant?

1    A    Yes.

2    Q    And during the course of those consensually monitored phone

3    recordings what, if any, admissions did the defendant make

4    regarding that June 28, the June 25, 2008 meeting?

5    A    The, the recording reveals that Mr. Canady acknowledged

6    having pulled a gun on the agent who had visited his farm

7    previously.

8    Q    In November of 2010, a search warrant was sought and,

9    sought and executed on the defendant's property and person, is

10   that correct?

11   A    Yes.

12   Q    Prior -- and that search warrant dealt with -- what were

13   you -- what had you sought permission to seize, search and

14   seize for?

15   A    Firearms and similar ammunition to go with firearms.

16   Q    Prior to execution of that warrant, what information did

17   you have about the defendant in terms of his criminal history?

18   A    We had, had information that Mr. Canady had been convicted

19   of involuntary manslaughter, which was punishable by more than

20   one year and then we had information, also, that he was in

21   possession of a, of a firearm.

22   Q    Okay.  Do you know the circumstances behind that

23   involuntary manslaughter conviction?

24   A    Yeah.  Based on the reading of the sheriff's department's

25   report, Mr. Canady killed his brother in a, in a car, with a

 1  car, vehicle.

 2  Q   Do you know what -- was it -- was there a fight or a

 3  dispute?

 4  A   Yes --

 5  Q   Tell the --

 6  A   -- prior to that.

 7  Q   Tell the Court about the dispute that led to the, the

 8  manslaughter count.

 9  A   Based on the report is that Mr. Canady and his brother were

10  in some type of dispute, fight, and at some point Mr. Canady

11  got in a vehicle and ran over his brother.

12  Q   Prior to the execution of the search warrant, were you

13  aware of the threats that had been made to Don Doles?

14  A   Yes.

15  Q   Okay.  So when officers executed on November -- well, on or

16  about November 22, 2010, did officers execute that search

17  warrant at the home of Harry Canady and his person?

18  A   Yes.

19  Q   What did the -- what did you guys find?

20  A   We found six firearms, three handguns and three long guns,

21  and various amounts of ammunition.

22  Q   Okay.  Now were there any guns found on or near the

23  defendant's person?

24  A   Yes.  A handgun was found just on a fence, on the ledge of

25  a fence just beside his person.

1  Q    Would you -- "this person" being the defendant?

2  A    Mr. Canady, yes, ma'am.

3  Q    Would you please describe -- were you present when that

4  weapon was found?

5  A    Yes.

6  Q    Would you please describe for the Court as you approached

7  what you observed and where the gun was found in relation to

8  the defendant?

9  A    Right.  That morning, we observed from across the street

10  Mr. Canady exit his residence.  At that time myself and several

11  other agents, federal agents and local officers, drove into his

12  property.  I parked my vehicle and got out on the left side.

13  My supervisor got out on the right side.  As we approached, my,

14  my supervisor inquired if he had any weapons and he indicated

15  that he did and he had just laid it down on the fencepost.  And

16  sure enough, I looked over just to my left, saw it, and, and

17  motioned my partner, Christy Weisel (phonetic), to secure the,

18  the weapon while I maintained my supervisor.

19  Q    And you -- and the other weapons that you mentioned, those

20  were found in his home?

21  A    They were found in the house.

22  Q    Okay.  Along with ammunition?

23  A    Yes.

24  Q    And those weapons are listed in the indictment in its

25  forfeiture proceeding, is that correct?

1  A    Yes.

2  Q    As the investigation continued, were there consensually

3  monitored phone recordings done in January and February of

4  2012?

5  A    Yes.

6  Q    During the course of those recordings, what were the nature

7  of some of the statements the defendant made?

8  A    The nature of the statements were directed towards killing

9  law enforcement officers that were to come back to his

10 property, that we had no business being on his property.  There

11 were several statements basically to that effect of killing not

12 just myself, but anyone who came to his property that didn't

13 have any right to be on his property.

14 Q    Did the defendant specifically name you, sir?

15 A    Yes.

16 Q    And what was your reaction when you listened to these

17 recordings for the first time?

18 A    It's quite chilling.  It's, it's not, not, not a good

19 feeling.

20 Q    Did you fear for the safety of your family and your person?

21 A    Yes.

22 Q    There was one statement that you highlighted to me in

23 preparing for your testimony today that's in the transcript.

24     Do you recall that statement, sir?

25 A    There was probably a couple, one being he was telling the

 1  person on, the other person conducting the phone call that,

 2  "You, you can't threaten someone unless you plan on killing

 3  them."

 4  Q   And in preparing for today's hearing, I asked you to assist

 5  me, or give me copies of the recordings so they could be

 6  transcribed?

 7  A   Correct.

 8  Q   And those -- you've reviewed those transcriptions?

 9  A   Yes.

10          MS. RANGARAJAN:  And those transcriptions, Your Honor,

11  have been attached, some of them have been attached to the

12  Government's motion for pre-trial detention.

13          THE COURT:  Yes, ma'am.  I'm familiar with them.

14  BY MS. RANGARAJAN:

15  Q   I'm going to turn your attention to June 21, 2012, just

16  last week.

17      Was the defendant arrested on that date?

18  A   Yes.

19  Q   Okay.  When the arrest was executed, were any firearms

20  found?

21  A   Yes.

22  Q   Please tell the Court where the firearm was found.

23  A   A firearm, a .22 pistol, was found by ATF agent, Mark

24  Oxendine, underneath Mr. Canady's bed.

25  Q   While agents -- and have you spoken to the agents that were

1   at the home during the, during the timeframe of the arrest?

2   A   Yes.

3   Q   And when that gun was found, who else was present in the

4   home?  Who was present in the home?

5   A   Mrs. Margaret Canady and, I believe, Mrs. Stephanie Canady.

6   Q   Do you know the relationship of Margaret Canady to the

7   defendant?

8   A   Mrs. Canady is the spouse of Mr. Canady.

9   Q   What statements did Mrs., Ms. Margaret Canady make to

10  agents regarding that firearm that was recovered underneath the

11  defendant's bed?

12  A   Statements made to Special Agent, IRS Special Agent Sherry

13  Lancaster was that shortly after the 2010 search warrant was

14  executed, the -- the -- this firearm that was found last week

15  was discovered and that they had been in possession of it since

16  then and that Mrs. Canady had informed Mr. Canady he needed to

17  get rid of it and that it had been a weapon that he had had for

18  years that, evidently, he had used it to go coon hunting, that

19  kind of thing.

20  Q   What was -- what kind of gun is it?

21  A   .22, .22 pistol.

22  Q   It's a handgun?

23  A   Yes.

24  Q   Easily concealed?

25  A   Yes.

1    Q    Did -- what, if any, statements did Ms. Margaret Canady

2    make regarding concerns for her person upon his arrest --

3    A    Right.

4    Q    -- upon the arrest of her husband?

5    A    Just that she was concerned about having to go pick him up

6    after having spent a night in jail, that he would not be very

7    happy, and they were concerned about who and how would, he

8    would be picked up.

9    Q    Did she make any statements regarding "He's crazy"?

10   A    Yes.

11   Q    What were the nature of those statements?

12   A    Is that he, since his incident back in the late nineties,

13   that he had been involved in drinking and that he was crazy.

14   That's my understanding from the IRS agent.

15   Q    Okay.  And what, if any, information did Ms. Margaret

16   Canady say regarding substance abuse, alcohol, by the

17   defendant?

18   A    That he was, had a drinking problem.

19   Q    When he was arrested, or when he was stopped by law

20   enforcement on June 21, 2012, was there an open container in

21   the car?

22   A    Yes.

23   Q    Is he known to drink early in the morning before he gets

24   into his car and drives around?

25   A    Yes.

1  Q    During the course of the investigation did you speak to any

2  of his daughters?

3  A    Yes, I spoke to all three.

4  Q    Okay.  Did any one of them mention to you whether or not

5  they were concerned for their personal safety?

6  A    Yes.

7  Q    Okay.  And what did that, without names, what did that one

8  individual say?

9  A    That individual indicated that they were, basically, were

10 in fear of Mr. Canady at all times.

11 Q    Every day of their life?

12 A    Yes.

13 Q    Now during the course of this investigation did the agents

14 learn of certain rental properties that were in the defendant's

15 -- that -- for which the defendant received the rental

16 payments?

17 A    Yes.

18 Q    Would you please tell the Court about what you learned in

19 connection with those rental properties?

20 A    Yeah.  According to the records of Cape Fear Farm Credit,

21 there are approximately 40 to 42 mobile homes that Mr. Canady

22 is responsible for and rents out and that there's 20 to 24 of

23 those mobile homes are on a piece of property owned by Mrs.

24 Stephanie Canady.  It's our understanding from Mrs. Stephanie

25 Canady that's in name only, that all the monies are collected

1   and maintained by Mr. Canady and Mrs. Canady.

2   Q   Do you know approximately how much per month each of those

3   42 homes brings in?

4   A   The financial statements range anywhere from 130 -- per

5   month?

6   Q   The rental -- well, just each rental -- the average rent,

7   monthly rental for each of the units, is it approximately $400

8   a month?

9   A   According to the Cape Fear Farm Credit records, it's

10  approximately $400 a month.

11  Q   And what is the gross rental income, according to the

12  records, for the rental property?

13  A   A little over 200,000.

14  Q   And it varies, usually?

15  A   Right.

16          MS. RANGARAJAN:  May I approach, Your Honor?

17          THE COURT:  You may.

18  BY MS. RANGARAJAN:

19  Q   I'm going to hand you what's been marked as Government's

20  Exhibit 6, Your Honor, to be added to our motion.  We have 1

21  through 5 to the motion.  (Counsel shows exhibit to the

22  witness.)

23          THE COURT:  Correct.

24          MS. RANGARAJAN:  And all these exhibits have been

25  provided to defense, Your Honor.

1          THE COURT:  Thank you.

2    BY MS. RANGARAJAN:

3    Q    Special Agent Davis, is that a balance sheet from Cape Fear

4    Farm Credit?

5    A    Yes.

6    Q    And what is the date of that balance sheet?

7    A    The date at the top is January 3, 2012.  The signature date

8    is January 18, 2012.

9    Q    And are these documents that came from the file of Cape

10   Fear Farm Credit?

11   A    Yes.

12   Q    And they were submitted by the defendant and his wife in

13   connection with their loan from Cape Fear Farm Credit?

14   A    Yes.

15   Q    And turn your attention -- so as of Jan -- and this is a

16   January 18, 2012?

17   A    Correct.

18   Q    Right below -- right above the signature lines, what is the

19   statement in tiny print?

20   A    (Reading):

21        "I/we certify the foregoing to be a true and accurate

22   representation of my/our balance sheet as of the dates

23   indicated."

24   Q    Okay.  Three lines up, what is the total assets declared by

25   the defendant on or about January 18, 2012?

1  A    2.8 million, approximately.  It's a little over that.

2  Q    Turn to Page 3, sir.

3  A    (Witness complies)

4  Q    There is a Rental Income, Gross.  What's declared for this

5  year?

6  A    168,000.

7  Q    There's also a Net -- a Gross Net -- not -- there's a Gross

8  Non-Farm Income.  What is that?  Do you see that line?

9  A    Gross, Gross Non-Farm Income of 264,000.

10  Q    Is there a Farm Income listed?  There's Farm -- Total --

11  okay.

12       Moving on, sir.  Hang on a second.

13       In that year, did the defendant receive farm income for

14  soybean sales of 161,000?

15  A    Yes.

16  Q    But again, the total assets that, that Harry Canady

17  represents to Cape Fear Farm Credit in January of 2012 is

18  approximately $2.8 million --

19  A    Yes.

20  Q    -- based on the cover sheet?

21  A    Yes.

22  Q    Thank you, sir.

23       And in preparing for -- there are two other exhibits that

24  the Government previously provided to the Court, which is

25  listed as Exhibit 4 and Exhibit 5.

 1        Those are balance sheets, is that correct, with Cape Fear

 2   Farm Credit as well?

 3   A    Yes.

 4   Q    And you, you assisted in preparing those for the exhibits,

 5   is that correct?

 6   A    Yes.

 7             MS. RANGARAJAN:  May I approach, Your Honor?

 8             THE COURT:  You may.

 9   BY MS. RANGARAJAN:

10   Q    And I'm going to show you the copies of those two exhibits.

11   (Counsel shows exhibits to the witness.)

12        Exhibit 4.  Could you tell the date -- tell the Court the

13   date that those were certified by the defendant to be true and

14   accurate?  Exhibit 4 being the October 2010.

15   A    Right.  It's signature date of November the 1st, 2010.

16        Exhibit 5 is April 28, 2011.

17   Q    Okay.  And what is the total assets for Exhibit 4 listed by

18   the defendant?

19   A    Approximately three million.

20   Q    And a few months later, he submits a, another balance sheet

21   to Cape Fear Farm Credit, is that your understanding?  The --

22   Exhibit 5.  Sorry.

23   A    Oh, I'm sorry.

24        Exhibit 5 is, again, April 28, 2011.  Total assets of 2.5

25   million.

1   Q    Okay.

2        I'm going to turn your attention to Exhibit 4 first, sir.

3   That Line 28, does the defendant list 42 mobile homes at

4   $400,000?

5   A    Yes.

6   Q    Okay.  Exhibit 5, Line 28, does the defendant again list 42

7   mobile homes at a value of $400,000?

8   A    Yes.

9   Q    Turn your attention to Exhibit 6, Line 28.  Again, among

10  his assets does the defendant list 42 mobile homes at $400,000?

11  A    Yes.

12            MS. RANGARAJAN:  Your Honor, may I have a moment

13  just --

14            THE COURT:  You may.

15       (Pause)

16  BY MS. RANGARAJAN:

17  Q    Shortly after the execution of the arrest warrant, did the

18  Government also seize pursuant to a post-indictment restraining

19  order bank accounts for the defendant?

20  A    Yes.

21  Q    In those bank accounts based upon information obtained from

22  IRS that's involved, is there any indication that the $20,000 a

23  month from this rental property has been deposited into those

24  accounts?

25  A    We're -- we are not seeing -- I have not seen any type of

 1  large cash deposits.

 2  Q    So right now, any monies from the rentals have been

 3  unaccounted for in his bank accounts --

 4  A    Yes.

 5  Q    -- no record?

 6       Based upon the investigation, how is that rent paid?

 7  A    By -- a lot of it by cash.

 8  Q    So approximately $20,000 a month in cash?

 9  A    Correct.

10       (Pause)

11            MS. RANGARAJAN:  Your Honor, at this time the

12  Government has no further questions for Special Agent Davis on

13  the issue of detention.

14            THE COURT:  Thank you, ma'am.

15            One question I had was where is the Total Assets line

16  on these statements?

17            MS. RANGARAJAN:  Your Honor, it's on the first page.

18  It is below Line 38.  So you'll see Total Long-Term Assets and

19  then right below it you'll see Total Assets.

20            THE COURT:  Oh, I see.  Okay.

21            MS. RANGARAJAN:  You also see Net Worth, which is over

22  $1 million in each of these declarations, some closer to more

23  than 1-1/2 million.

24            THE COURT:  I see.

25            Okay.  Thank you.

 1          Mr. Neyhart, sir?

 2          MR. NEYHART:  Yes, Your Honor.

 3                    CROSS-EXAMINATION

 4   BY MR. NEYHART:

 5   Q    Good afternoon, Mr. Davis.

 6        With respect to the bank accounts that you have frozen, was

 7   it your testimony that you did not see any payments that would,

 8   or deposit reflecting any rental, any rental amounts?

 9   A    There are -- no.  There are deposits reflecting some

10   rental, but large cash deposits I've not seen.

11   Q    Okay.  And are you aware how many of those trailers are

12   currently rented or not rented?

13   A    I'm not aware of that.

14   Q    So you're -- so you would not be aware that at least ten

15   are vacant at this point?

16   A    No.

17   Q    But just to clarify, you are seeing money coming in that is

18   identified as -- as a rent -- some sort of rental payment from

19   that period?

20   A    We are -- I've seen records from the Lumberton Housing

21   Authority that come to Mr. Canady.

22   Q    With respect to the, the bank account, are you seeing any

23   deposits that would indicate in any way that it was proceeds

24   from any rental amounts from this trailer park?

25   A    My recollection is there, there's some deposits that may

1  say "Rent" in the Memo line.

2  Q   Okay.  And are you also seeing expenditures for rental,

3  electric and other bills with respect to the trailer park?

4  A   I don't specifically recall them in specifics, but

5  generally, yes.

6  Q   Okay.  You had talked about an incident on or around June

7  25, 2008 with respect to, I believe you testified, Special

8  Agent Don Doles and you based your testimony on your personal

9  conversations with Mr. Doles and, and the record, is that

10  correct?

11  A   Yes.

12  Q   Was there any indication from Mr. Doles either in the

13  record or from you personally that he had contacted Mr. Canady

14  previously, previous to coming onto his property?

15  A   Yes.  The, the first occasion was in 2007, approximately a

16  year prior -- it was the, June, July, August.  I don't recall

17  exactly -- but approximately a year prior to this --

18  Q   Uh-huh.  (Indicating an affirmative response)

19  A   -- he and Investigator Paul Lett had visited Mr. Canady.

20  Q   Okay.  But, but immediately prior to the, the June 25, 2008

21  episode he didn't call ahead and, and ask Mr. Canady or let him

22  know, "We're coming by.  We'd like to talk to you"?

23  A   I have no knowledge of that.

24  Q   Okay.

25  A   I do not recall, I do not recall Mr. Doles saying that he

 1  had called ahead of time.

 2  Q    Okay.  And was there any, anything in either the report or

 3  in your personal conversation that would reflect the fact that

 4  Mr. Canady was in the middle of, of spraying some highly

 5  poisonous chemicals on his property at that time?

 6  A    My recollection is the Memorandum of Interview and/or a

 7  conversation was that Mr. Canady was busy --

 8  Q    Uh-huh.  (Indicating an affirmative response)

 9  A    -- conducting some type of spraying.

10  Q    Okay.  And was, to the best of your knowledge, was he upset

11  because he believed your co-agent was, in his, in his mind,

12  trespassing while he was trying to spray and, and it could be a

13  danger to him?

14  A    Yes.  Mr. Canady had, had referenced or asked Mr. Doles did

15  he see the No Trespassing sign.

16  Q    Okay.

17  A    And Mr. Doles said no.

18  Q    Okay.  Okay.

19       Is there any reference to the Hazardous Waste signs in, in

20  the Memorandum you saw?

21  A    Not to my recollection.

22  Q    Okay.  Did Mr. Canady, after confronting Mr. Doles, ever

23  say anything to him after he left the property?

24  A    No.  There was no further contact after that date --

25  Q    Okay.

1  A    -- with Mr. Doles.

2  Q    So, so Mr. Canady did, then, he did not retaliate in any

3  way for Mr. Doles coming onto his property?

4  A    The only contact was that day in which he threatened to get

5  his gun, the only contact I'm aware of.

6  Q    Yeah.  And after that incident, nothing ever happened as

7  far as any type of other conduct by Mr. Canady up until 2012?

8  A    Correct.

9  Q    Okay.  And isn't it true that you had scheduled a meeting

10  with -- well, back up.

11      Isn't it true that a target letter was sent to Mr. Canady?

12  A    Yes.

13  Q    Okay.  And is it, isn't it true that you, you and I

14  personally met at your office to, to discuss some of the

15  evidence you believe implicated Mr. Canady?

16  A    Yes.

17  Q    Okay.  And after that meeting isn't it true that, that we

18  scheduled a meeting with Mr. Canady in the first floor of this

19  court, of this building?

20  A    Yes, it is.

21  Q    Okay.  And at that meeting did Mr. Canady do anything that

22  was disruptive, in your view?

23  A    No, sir.

24  Q    Okay.  Is it fair to say he was listening to what you were

25  trying to, what you had to say?

1    A    Yes.

2    Q    Okay.  And did he make any threats to you at that time?

3    A    No.

4    Q    And did he -- did he attempt to contact you or any of your

5    family members in any way after that meeting?

6    A    No, sir.

7    Q    And did he at any time from 2008 till today make, made any

8    statements to you directly --

9              MR. NEYHART:  Well, let me rephrase that questions,

10   Your Honor.

11   BY MR. NEYHART:

12   Q    Did Mr. Canady, after we met in 2010 and prior to the, the

13   search warrant being executed in November 2010, did he make any

14   statements or threats to any other Government agent that you're

15   aware of?

16   A    No.

17   Q    Okay.  And did he make any other, in that time period, any

18   other states [sic] and threats to any other, any family member

19   of, of any Government agent that you're aware of?

20   A    No.  But would you repeat the timeframe you're referring to

21   again?

22   Q    I'm, I'm speaking about the timeframe between the time we

23   initially met and November 2010, which, I believe, is when you

24   executed a search warrant?

25   A    So between our meeting and the execution of the search

1    warrant?

2    Q    That's correct.

3    A    No, no information --

4    Q    Okay.

5    A    -- that he's contacted.

6    Q    All right.

7         Now when you executed the search warrant, is it, isn't it

8    true that, that you and some of the other officers who executed

9    had your weapons drawn?

10   A    Yes.  That's -- based on the situation that we had of a

11   known convicted felon with probable cause that he was in

12   possession of a firearm, when my -- when we -- I was the first

13   vehicle that approached -- when my supervisor got out he first

14   made contact with Mr. Canady and had his weapon.  I come from

15   the other side and had my weapon drawn.

16   Q    Okay.

17   A    When my, my supervisor placed Mr. Canady in, in, in

18   handcuffs for his --

19   Q    Uh-huh.  (Indicating an affirmative response)

20   A    -- for our safety and his safety, then weapons were put

21   back in place.

22   Q    And is it fair to say that Mr. Canady was surprised by the,

23   the show of force that you, that you used when you searched his

24   house?

25   A    On the day of, I have no opinion of whether he was

1   surprised or not.

2   Q   Uh-huh.  (Indicating an affirmative response)

3   A   Subsequently, he has expressed his --

4   Q   Uh-huh.  (Indicating an affirmative response)

5   A   -- his concern about us having our weapons.

6   Q   Weapons drawn.

7       Let's, let's go back to Mr. Canady's criminal history.

8       Are you familiar with Mr. Canady's criminal history?

9   A   Yes.

10  Q   And you had referenced the, the incident in 1997 involving,

11  involving his brother, is that correct?

12  A   Yes.

13  Q   Are you aware of any other -- since that time, are you

14  aware whether of -- are you aware of any other charges

15  Mr. Canady has had for any type of violent conduct?

16  A   Violent conduct?

17  Q   Yes.

18  A   No, sir.

19  Q   Okay.  And with respect to the, the unfortunate statements

20  of Mr. Canady that you have, that you have transcripted and

21  they're in the Government's motion, I'd like to call your

22  attention to Document No. 16, the motion for pre-trial

23  detention.

24      Do you have a copy of that, or should we approach?

25  A   I do not.

 1          MS. RANGARAJAN:  He does not have a copy of the --

 2          MR. NEYHART:  Do you want to give it to him, or should

 3  I approach with it?

 4          MS. RANGARAJAN:  What do you want, the --

 5          MR. NEYHART:  Just the motion.

 6          MS. RANGARAJAN:  Do you want the --

 7          MR. NEYHART:  Motion.

 8          MS. RANGARAJAN:  -- the transcripts that are attached?

 9          MR. NEYHART:  What you have if they were admitted.

10          MS. RANGARAJAN:  Okay.

11          Your Honor, may I, may I approach with my trial

12  binder?  It's got the pre-trial motion.

13          THE COURT:  You may.

14          MS. RANGARAJAN:  Special Agent Doles, I mean, Miles

15  Davis, I'm going to hand you my copy of the pre-trial motion

16  with the exhibits attached.

17      (Document handed to the witness)

18          THE COURT:  There is some highlighting on that

19  document, Mr. Neyhart.  Is that a problem?

20          MR. NEYHART:  I don't think it'll be a problem for

21  these purposes.

22          THE COURT:  Okay.

23  BY MS. NEYHART

24  Q   I, I'd like to call your attention, Mr. Davis, to the, the

25  motion for pre-trial detention.

 1           THE COURT:  And this is at Docket Entry 16, correct?

 2           MR. NEYHART:  That's correct, Your Honor.

 3   BY MR. NEYHART:

 4   Q    And I'd like to call your attention to Page, Page 6.

 5   A    Yes, sir.

 6   Q    And the, the cooperating witness in this, in this phone

 7   call says near the bottom, "As long as they ain't got their gun

 8   pulled, you all right, though, right?"  Do you see that?

 9   A    Yes.

10   Q    And is that a fair and accurate transcription of what the

11   cooperating witness said at that, at that point?

12   A    Yes.

13   Q    And then Mr. Canady replied, "Yeah.  If they ain't got

14   their damn gun pulled, fine."  Is that --

15   A    That's what the transcript reads.

16   Q    -- what the transcript reads?  Okay.

17        After you served the warrant on, on Mr. Canady in November,

18   did, did Mr. Canady make any threats directly to you

19   personally?

20   A    No.  The only direct threats were to Agent Doles.

21   Q    Okay.  And at the, at the time Mr. Canady said these words,

22   he didn't know that you, you were recording this, is that

23   correct?

24   A    No.  I wouldn't think he did.

25   Q    Okay.  And at the time Mr. Canady said that, he had, he had

1   no way of knowing you were recording that, is that correct, to

2   the best of your knowledge?

3   A    Correct.

4   Q    And since November 2010, Mr. Canady has not made any

5   statements threatening your family, is that correct?

6   A    No.

7   Q    That is not correct, or there's no statements?

8   A    No.  No, there's been no -- I'm sorry.  There's been no

9   threats specific to my family.

10  Q    Okay.  And since November 2010 Mr. Canady never directed

11  any specific threats to any other agents, is that correct?

12  A    Since 2010?

13  Q    November 2010.

14  A    The recordings and the transcripts --

15  Q    Right.

16  A    -- would, would indicate that Mr. Canady has threatened any

17  law enforcement that comes on his property, including the local

18  sheriff.  He makes a comment -- and I'm speaking generally --

19  that --

20  Q    Uh-huh.  (Indicating an affirmative response)

21  A    -- if the, if the deputies or sheriff deputies are on his

22  property --

23  Q    Uh-huh.  (Indicating an affirmative response)

24  A    -- he'll call the sheriff and get them to leave.  He don't

25  want anybody on his property --

 1  Q    Uh-huh.  (Indicating an affirmative response)

 2  A    -- of any sort.

 3  Q    Uh-huh.  (Indicating an affirmative response)

 4  A    Law enforcement or not.

 5  Q    And when, and when Mr. Canady was, was arrested a week ago

 6  there was no, there was no incident, is that correct?  I mean,

 7  he was peacefully arrested?

 8  A    He did not resist.  Mr. Canady, once I had him in custody

 9  in our vehicle --

10  Q    Uh-huh.  (Indicating an affirmative response)

11  A    -- Mr. Canady started to say, to speak --

12  Q    Uh-huh.  (Indicating an affirmative response)

13  A    -- and I stopped him --

14  Q    Uh-huh.  (Indicating an affirmative response)

15  A    -- for his own benefit and asked him to be careful what he

16  says.  But --

17  Q    Uh-huh.  (Indicating an affirmative response)

18  A    -- I'd be happy to, to quote what he started to say, with

19  permission.  Out of respect for the Court, it's not very

20  pretty.

21          THE COURT:  Well, let's --

22  BY MR. NEYHART:

23  Q    I have not asked that question.  The prosecutor may.

24          THE COURT:  We've heard it all, folks, so I'm sure

25  it's nothing that I haven't heard before.

1   BY MR. NEYHART:

2   Q   In, in this case, did you recall me asking you to allow

3   Mr. Canady the chance to turn himself in if you indicted him?

4   A   In, in deference of trying to be totally truth, somewhat,

5   yes, but I've had so many defendants over the last four or five

6   years --

7   Q   Uh-huh.  (Indicating an affirmative response)

8   A   -- that request has been made, I don't deny that you said

9   that, but I -- I would just have -- my  testimony would have to

10  be I vaguely remember that.

11  Q   Okay.  And what is your usual policy with respect to

12  defendants you're about to arrest under an indictment?

13  A   I'm a new agent.

14  Q   Uh-huh.  (Indicating an affirmative response)

15  A   I've only had one other indictment -- it wasn't my case --

16  one other indictment, but my understanding, my discussions with

17  this is based on the nature of the threats, that we were going

18  to not do self-report.

19  Q   Okay.

20      (Pause)

21  BY MR. NEYHART:

22  Q   Are you aware of, with respect to the incident in, in June

23  25, 2008, were you aware of Mr. Canady's contention that it was

24  illegal for anyone, any other individual to be around because

25  of the nature of his spraying?

 1  A    That sounds familiar.  I'm not sure when I became aware of

 2  that, whether it was when we met with Mr. Canady and yourself.

 3  Q    Uh-huh.  (Indicating an affirmative response)

 4  A    But at some point along the line I am aware of that.  And

 5  it may be -- it may be in the Memorandum of Interview.  I don't

 6  specifically recall.

 7  Q    Okay.

 8           MR. NEYHART:  Your Honor, I have no further questions.

 9           THE COURT:  Thank you.

10           Ms. Rangarajan?

11           MS. RANGARAJAN:  Just a few follow-up questions.

12                        REDIRECT EXAMINATION

13  BY MS. RANGARAJAN:

14  Q    Special, Special Agent Davis, when you spoke to Special

15  Agent Doles about the June 25, 2008 incident, at any point did

16  Mr. Canady express concern for Mr. Doles' safety when he was

17  out on that property?

18  A    No.

19  Q    In fact, he was yelling and angry at Mr. Doles for being

20  present, correct?

21  A    Yes, he was angry.

22  Q    And based upon the year preceding, in June, in June of

23  2007, one year prior to the threat, Doles had been to, Special

24  Agent Doles had been to the property, had spoken to Mr. Canady,

25  is that correct?

1    A    Yes.  That, in fact, that's, that's when he lied to Special

2    Agent Doles about the initial contact, which Mr. Canady has

3    admitted to the truth in a subsequent interview with me.

4    Q    But Special Agent Doles and the defendant met in June of

5    2007, is that correct?

6    A    Yes.

7    Q    So based upon that contact Mr. Canady was fully aware that

8    Special Agent Doles was an agent for USDA-OIG?

9    A    Yes.

10   Q    And on June 25, 2008 at any point did Mr. Canady express

11   concern for Mr. Doles', Special Agent Doles' safety?

12   A    The only thing that I can vaguely remember -- it may be

13   something in the Memorandum of Interview -- about chemicals.

14   Q    But did he say -- when he threatened him with a gun, was

15   that because he was worried about his exposure to chemicals?

16   A    No.

17   Q    He didn't want Special Agent Doles on the property, is that

18   correct?

19   A    Correct.

20   Q    Why did you -- you know, defense counsel asked you about

21   the meetings in the Federal Building.  Why were the meetings

22   scheduled here?

23   A    In an attempt, after the target letter, to discuss the

24   case.

25   Q    Why did you choose to hold the meetings in the Federal

 1  Building as opposed to USDA offices?

 2  A    Sure.  Based on the threats in 2008, we wanted it to be in

 3  a secure facility where they come through the metal detector.

 4  And I put the court security officers on notice.

 5  Q    Okay.  Now the defendant had no knowledge that he was being

 6  recorded during the consensually monitored calls in 2012?

 7  A    No.

 8  Q    Based upon -- which would make him more free to have open

 9  communications with the other individuals, is that correct?

10  A    Yes.

11  Q    Unguarded communications?

12  A    Correct.

13          MS. RANGARAJAN:  No further questions for Special

14  Agent Davis, Your Honor.

15          THE COURT:  Thank you, ma'am.

16          Mr. Neyhart?

17          MR. NEYHART:  Thank you, Your Honor.  I have just one

18  topic I'd like to explore.

19                      RECROSS EXAMINATION

20  BY MR. NEYHART:

21  Q    There was a reference to, by the prosecutor, to Mr. Canady

22  "threatening" Mr. Doles with a gun.

23      Did I understand your testimony correctly that he informed

24  Mr. Doles that he had a gun --

25  A    The --

1    Q    -- and that was the nature of his threat?

2    A    The nature was Mr. Canady said, "I'm going to get my gun."

3    Agent Doles told me he didn't never, he never saw the weapon.

4    It was later in these recordings which Mr. Canady admitted

5    having pulled a gun on Mr. Doles.

6    Q    Well -- okay.

7         But in the initial reports you don't -- you -- you did --

8    Mr. Doles did not write that he actually had a gun pointed at

9    him, is that correct?

10   A    That is correct.  He just -- his words in his Memorandum of

11   Interview pertinent to this question is Mr. Canady was going to

12   get his gun.

13   Q    Okay.

14   A    Mr. Doles has talked to me and felt that it was in his

15   console, but he never saw the weapon.

16   Q    Okay.

17            MR. NEYHART:  Your Honor, I have no further questions

18   for Mr. Davis.

19            THE COURT:  Thank you.

20            Ms. Rangarajan?

21            MS. RANGARAJAN:  Nothing further, Your Honor --

22   BY THE COURT:

23   Q    Sir --

24            MS. RANGARAJAN:  -- with this, with this defendant

25   or --

 1            THE COURT:  That'll be fine.

 2            MS. RANGARAJAN:  -- with the agent.  I'm sorry.

 3            THE COURT:  That's all right.

 4            MS. RANGARAJAN:  But may I --

 5   BY THE COURT:

 6   Q   Sir, I wanted --

 7            THE COURT:  I had a question for --

 8            MS. RANGARAJAN:  Ooh, sorry.

 9   BY THE COURT:

10   Q   The comments -- I just wanted to -- I, I assume this would

11   have been brought out -- but when you arrested Mr. Canady on

12   the, on the indictment in this case -- I gather he used foul

13   language with you -- but was there -- and I'm assuming that.

14   There's been no testimony -- but was there any threat?  Did he

15   convey any threat to you at that time?

16   A   No, sir.

17   Q   Okay.

18            MS. RANGARAJAN:  I have no further questions for

19   Special Agent Davis, Your Honor.

20            THE COURT:  That'd be fine.

21            MS. RANGARAJAN:  May I approach, Your Honor --

22            THE COURT:  You may.

23            MS. RANGARAJAN:  -- to collect my binder?

24            THE COURT:  You may step down, sir.

25            THE WITNESS:  Thank you, sir.

1          THE COURT:  Ms. Rangarajan, do you have further need

2     of Exhibit 6?

3          MS. RANGARAJAN:  I do not have further need of Exhibit

4     6, Your Honor.  I have a copy for you.

5          THE COURT:  Well, let me -- while we're --

6          MS. RANGARAJAN:  But --

7          THE COURT:  If I could, just, just for the record,

8     note that the Memorandum has already been -- well, the motion

9     has already been identified by docket entry.  It's the

10    Government's motion for pre-trial detention.  It's at Docket

11    Entry 16.  The exhibits that are referenced are at -- they're

12    successfully -- successively -- they've already been filed --

13    Documents 1, 2, 3, 4, and 5 at 16-1, 16-2, 16-3, 16-4, and 16-

14    5.

15         So they are already, as far as I'm concerned, part of

16    the record of our case here for purposes of the motion.

17         And I assume that the Government seeks to have Exhibit

18    6 made part of the record of this proceeding as well?

19         MS. RANGARAJAN:  Yes, please.

20         THE COURT:  Very good.  I'll direct that that be

21    filed.

22         Mr. Neyhart, I don't mean to leave you out of this

23    conversation.

24         Did you wish it be heard with respect to any of these

25    exhibits?

1     MR. NEYHART:  No, Your Honor.  You were speaking and I

2 thought I should rise out of respect for the Court.

3     THE COURT:  Well, I appreciate that.

4     I gather the Government has more evidence, is that

5 correct, Ms. Rangarajan?

6     MS. RANGARAJAN:  Your Honor, I can reserve for

7 argument, but the Government is going to be relying on the

8 defendant's consensually monitored recordings and I want to

9 highlight things to the Court that are in those recordings.

10     So by -- I can either do it now by way of the

11 Government's evidence -- and it is probably appropriate -- but

12 if the Court does not want to hear from me, I also understand

13 that as well.

14     THE COURT:  The Court does want to hear from you, but

15 I would rather reserve that for argument because then I can

16 hear Mr. Neyhart's response, to the extent he has one.

17     MS. RANGARAJAN:  Okay.

18     So we would rely on -- we have our motion for pre-

19 trial detention that's been filed and have summarized the

20 transcripts, but the transcripts as transcribed by the court

21 reporter are attached and so those would govern, if there is a

22 typo in my transcription.

23     The Government would also note, Your Honor, to the

24 Court that when Probation did their report they did not have

25 the benefit of Exhibit 6.  They did not -- it appears they did

 1   not have the benefit of the attachments to the Government's

 2   exhibit -- I'm sorry -- the exhibits attached to our pre-trial

 3   motion.

 4           THE COURT:  Yes.

 5           MS. RANGARAJAN:  And so in terms of some of their

 6   analyses, the Government does not know if they had the

 7   information in order to prepare it.

 8           THE COURT:  I understand.

 9           MS. RANGARAJAN:  But we would be submitting all of

10   these exhibits to counterpoint and we'll argue at the

11   appropriate time.

12           THE COURT:  That'll be fine.

13           The Court has reviewed the Pretrial Services report to

14   which counsel is referring as well.

15           Mr. Neyhart, any evidence for the defendant, sir?

16           MR. NEYHART:  Your Honor, I am prepared to call

17   Mrs. Canady as a potential third-party custodian if that would

18   be appropriate at this time.

19           THE COURT:  Well --

20           MR. NEYHART:  Or are you still going to be ruling on

21   the issue of detention before getting to that point?

22           THE COURT:  No.  I think if, obviously --

23           MR. NEYHART:  She's identified in the Pretrial

24   Services report.

25           THE COURT:  Yes.  I'm familiar with that.

1          I think if, if the defendant wishes me to consider

2     Mrs. Canady as part of a release plan --

3          MR. NEYHART:  Uh-huh.  (Indicating an affirmative

4     response)

5          THE COURT:  -- I would need to hear from her.  But

6     whether to call her or not is up, is up to the defendant.  I

7     will not consider her as a third-party defendant if she does

8     not testify.

9          MR. NEYHART:  Okay.

10          At this time I would like to call Mrs. Canady.

11          THE COURT:  I should say as a third-party custodian,

12     not a third-party defendant.

13          MR. NEYHART:  Yes, Your Honor.

14          THE COURTROOM DEPUTY:  Come on up here, please, ma'am.

15     And raise your right hand, left hand on the Bible.

16          MARGARET CANADY, DEFENSE WITNESS, SWORN

17          THE COURTROOM DEPUTY:  Have a seat right up there,

18     please, ma'am.  And, ma'am, please state your name for the

19     record.

20          THE WITNESS:  Margaret Canady.  Margaret Hakins Canady

21     (phonetic).

22                    DIRECT EXAMINATION

23     BY MR. NEYHART:

24     Q   Good afternoon, Ms. Canady.

25     A   Good afternoon.

1  Q    What is your relationship to Harry Canady?

2  A    It's my husband.

3  Q    How long have you been married?

4  A    44 years.

5  Q    And during the course of those 44 years how often have --

6  where have you lived?

7  A    On Highway 301 North in Lumberton.

8  Q    For all those 44 years you lived --

9  A    Well, yes.

10  Q    -- at that one address?

11  A    We -- the present home we live in we've lived in 36 years,

12  36 years, but probably half a mile down the road we lived there

13  for like 9 years.

14  Q    Okay.  And do you have a phone in your address?

15  A    Yes, sir.

16  Q    Okay.  Do you recall any type of a worthless check

17  conviction in 2000 that you experienced?

18  A    No, sir.  I've never had a worthless check.

19  Q    Okay.

20  A    No, sir.

21  Q    Is there another individual in the area with your name that

22  you have been confused with in the past?

23  A    Yes, sir.

24  Q    Can you describe to the Court a little bit about that?

25  A    Well, the first I learned about it is some deputy come up

 1  to my -- I have a beauty shop behind my house -- one night

 2  wanting to know something about my sons and I told him I didn't

 3  have any sons.  I only had daughters.  And then --

 4  Q    Uh-huh.  (Indicating an affirmative response)

 5  A    -- I found out that there, there was another Margaret

 6  Canady, but she was on another road.

 7  Q    Uh-huh.  (Indicating an affirmative response)

 8  A    So.

 9  Q    Uh-huh.  (Indicating an affirmative response)

10  A    And since then I've had like calls from the hospital

11  requesting payment for a Margaret Canady and we got that

12  straightened out that I'm, I was not that Margaret Canady.

13  Q    Okay.  In your, in your residence, do you have land-line

14  telephone?

15  A    Yes, sir.

16  Q    Okay.  And are you willing to serve as the third-party

17  custodian for your husband on release --

18  A    Yes, sir.

19  Q    -- if the Court decides to order that?

20  A    Yes, sir.

21  Q    And are you aware that as part of your duties as a third-

22  party custodian that you'd have to be familiar with all the

23  terms and conditions of his release, is that correct?

24  A    Yes, sir.

25  Q    And you're also aware that if he violates those terms and

 1  conditions of release it's your duty to report him, are you

 2  aware of that?

 3  A    Yes, sir.

 4  Q    And are you willing to do that?

 5  A    Yes, sir.

 6  Q    All right.  Are you -- or -- are you currently working

 7  anywhere?

 8  A    No, sir.  Well, I do part time at a beauty shop right

 9  behind my house.  It's very, very limited, though.

10  Q    Okay.  And do you have the capability to coordinate with

11  Mr. Canady to keep, keep track of where he is?

12  A    Yes, sir.

13  Q    Okay.

14          MR. NEYHART:  Your Honor, I have no further questions

15  for Ms. Canady.

16          THE COURT:  Thank you, sir.

17          Ms. Rangarajan?

18          MS. RANGARAJAN:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20  BY MS. RANGARAJAN:

21  Q    Good afternoon, Ms. Canady.

22  A    Good afternoon.

23  Q    You and I haven't met.  My name is Banu Rangarajan.  I'm an

24  Assistant U. S. Attorney.  I'm going to ask you a few

25  questions.  If you don't understand my questions, please ask me

1   and I'll try to clarify it for you.

2       You just took an oath to tell the truth.  You understand

3   that?

4   A   Yes.

5   Q   And that even if someone has asked you to lie for them,

6   that you swore to tell this Court the truth?

7   A   Yes, sir.

8   Q   Okay.  So how long have you been married to the defendant?

9   A   44 years.

10  Q   Were you aware of your, the 1997 conviction for involuntary

11  manslaughter --

12  A   Yes, sir.

13  Q   -- that your, your husband had?

14  A   Yes, sir.

15  Q   And that was his brother, correct?

16  A   Yes, sir.

17  Q   And the result of that tragic event was that they were

18  fighting, correct?

19  A   Yes, sir.

20  Q   And your husband got in his car and drove over his brother?

21  A   Yes, sir.

22  Q   Was alcohol involved?

23  A   On both sides, yes.

24  Q   Does your husband have a drinking problem?

25  A   Yes, sir.

1   Q    How much does he drink a day?

2   A    It varies.  He only drinks beer.  He doesn't, he doesn't

3   indulge in, you know, hard liquor or anything.  He only drinks

4   beer.

5   Q    Does he get a temper when he drinks?

6   A    Sometimes.

7   Q    So he drinks every day, is that --

8   A    Well, basically, yeah.  There may be some days.

9   Q    Does he get up in the morning and go to the convenience

10  store and buy alcohol?

11  A    I've heard that.  I am -- I have not seen it on my own.  I

12  have -- that -- you know, that's just --

13  Q    Does he drive with open containers in his car?  Does he

14  drive when he's drinking?  Does he drink beer and drive?

15  A    I don't, I don't ride with him.

16  Q    Okay.  Did -- were you present when the officers executed a

17  search warrant on November 22, 2010 at your home?

18  A    Yes, ma'am.

19  Q    And at that time after they left did you and your husband,

20  Mr. Canady, discover another weapon in the house?

21  A    Not at that time.  It was probably several months later

22  when I was cleaning out a closet.

23  Q    Okay.  So sometime within several months of 2010, November

24  of 2010, you discovered a firearm in the house?

25  A    Yes.

1  Q    Was it a .22 caliber pistol?

2  A    Yes.

3  Q    Handgun?

4  A    Uh-huh.  (Indicating an affirmative response)

5  Q    What'd you do with it?

6  A    I, I put it away.

7  Q    Where did you put it?

8  A    Under my bed.

9  Q    Did you give it to your husband?

10 A    Yes, ma'am.

11 Q    When did you give it to your husband?

12          THE COURT:  Let me, let me stop you, Ms. Rangarajan.

13          We're getting into an area of where this line of

14 questioning could expose this defendant to criminal liability.

15 BY THE COURT:

16 Q    Ma'am, I need to advise you that you have the right to,

17 against self-incrimination, meaning you cannot be forced to

18 answer questions that could expose you to criminal liability.

19          THE COURT:  I question the need for this line of

20 questioning.  We, we got evidence that there was this .22

21 caliber pistol.

22          MS. RANGARAJAN:  Your Honor, the defense has offered

23 her as a third-party custodian, somebody who would report to

24 the Court when the defendant is violating the laws.  She knew

25 he was violating the law subsequent to the November 2010

 1  executed, execution of the search warrant.  We have information

 2  -- she told officers she told the defendant not to have it and

 3  yet it stayed in the house, never reported, and it was found in

 4  2012 under his bed.

 5          So she is -- and I believe the evidence would come out

 6  that she feels threatened by the defendant and, therefore,

 7  would not be able to act as a suitable third-party custodian.

 8  So that is the nature of the line of questioning, Your Honor,

 9  is that she has not reported him to law enforcement, has not

10  turned that gun in, and that the defendant -- she could not

11  supervise as a third-party custodian the defendant, Your Honor.

12          THE COURT:  Mr. Neyhart?

13          MR. NEYHART:  Yes, Your Honor.

14          In response to that, I, I would state that there's a

15  difference between having the affirmative duty as a third-party

16  custodian to, you know, to report any violation versus a

17  generic duty, which I don't believe exists, to turn your spouse

18  in.  In fact, there's probably privilege against that.

19          So I don't believe that this is an appropriate line

20  of, of questioning and to the extent it is, I think we've

21  probably gotten to the, the extent of whatever evidence you

22  could get from it.

23          THE COURT:  It's hard for me to conceive of any

24  further testimony this witness would give that would constitute

25  her as a suitable third-party custodian based on what I've

1    heard.

2              I've heard enough about the pistol.  If you want to

3    continue your cross-examination, you can, Ms. Rangarajan, but,

4    as I say, I think, I really think the ball is more in the

5    defendant's court at this time to convince the Court that this

6    would be a suitable arrangement.

7              MS. RANGARAJAN:  If the Court is, is so convinced,

8    then the Government has no further questions for this witness.

9    If the Court --

10             THE COURT:  Thank you, ma'am.

11             Mr. Neyhart, any further questions for this witness?

12             MR. NEYHART:  Yes, Your Honor.

13                          REDIRECT EXAMINATION

14   BY MR. NEYHART:

15   Q   Ms. Canady, do you, do you believe you have the ability to

16   report any activity by Mr. Canady that would violate his

17   conditions of release?

18   A   Yes, sir, I do at this time.  I do believe I could, I would

19   report anything.  I do, if I'm answering that correctly.

20   Q   Uh-huh.  (Indicating an affirmative response)

21             MR. NEYHART:  I have no further questions, Your Honor.

22             THE COURT:  Ms. Rangarajan?

23             MS. RANGARAJAN:  No, Your Honor, no further questions.

24             THE COURT:  Very good.

25             You may step down, ma'am.

1          Mr. Neyhart, is there any further evidence for the

2    defendant?

3          MR. NEYHART:  No, Your Honor.

4          THE COURT:  Very good.

5          Ms., Ms. Rangarajan, I'll be happy to hear your

6    argument at this time.

7          MS. RANGARAJAN:  Thank you, Your Honor.

8          Your Honor, the Government has moved for detention in

9    this case as the Government believes there are no conditions or

10   combinations of conditions that can assure the safety of the

11   community as well as ensure the defendant's appearance.

12         You've heard the -- some of the factors that the Court

13   is required to consider are the nature and circumstance of, of

14   the offense, including whether or not it involves a firearm.

15   We've got felon in possession, we have threats against law

16   enforcement officers, in addition to the fraud allegations set

17   forth in the indictment.  You've got a crime of violence, the

18   threats of retaliating to kill.

19         You also -- you heard the Government's evidence.  It's

20   strong.  By way of summary, the weight of the evidence will

21   include audio recordings of the defendant, include prior

22   convictions that he does not, you know, involuntary

23   manslaughter.  Wife's aware of it.  So the -- and then the crop

24   insurance fraud includes bank records which reflect two

25   different sets of information, one that the defendant's

1    provided to the bank when it favors him and the other to the

2    Government when it favors him to get crop insurance, fraud.

3            But perhaps more important to all of this is the

4    defendant's statements.  What he says in those recordings are

5    critical, I think, to describe the nature of this person when

6    he is unguarded and free to talk.  These are the things that he

7    says and admits.  He admits in a January 23, 2012 consensually

8    monitored call, "I pulled a gun on there.  I pulled a gun on

9    the man that come to my goddamn property."  Cooperating

10   witness, "Lord, have mercy."  The defendant says, "He ain't got

11   no business on my goddamn property.  The mother fucker didn't

12   have a business on my goddamn property and I told him.  I told

13   my lawyer that, I said, 'Listen, if he ever comes back, come

14   back to kill me because I am going to kill him.'" "You still

15   have" -- the cooperating witness asked, "You still got guns?"

16   Mr. Canady, "Yes.  Hell, yes."  And, in fact, law enforcement

17   officers six months later find a firearm underneath his bed.

18           Mr. Canady also says, "If he comes back to my house

19   again, I'm going to assume he's trying to kill me.  I'm going

20   to try to kill him first."  Goes on, Mr. Canady says, "I mean,

21   I ain't going to sit.  Next time, I won't let, next time I

22   won't give him no goddamn, no damn guns.  He'll have to kill

23   me."  Later that same, in that same conversation, he, you know,

24   he basically -- "he," the defendant -- Mr. Canady singles out

25   Miles Davis, the agent in this case, and he talks about that

time they met up in the Federal Building.  Mr. Canady says, "I
told him, I said, 'Now let me tell you one goddamn thing.'  I
told the lawyer, I said, 'If Miles Davis would open his mouth
for just to say something out of the way, don't think I ain't
gonna knock the hell out of him or slap the fuck out of him
right here in this goddamn building.  You know what I'm
saying?'"  Cooperating witness, "Yes."  Mr. Canady, "It
wouldn't, it wouldn't have took me much for me to slap him
right there in front of me."  Cooperating witness, "You don't
want to be doing that.  You'll end up where I was."
Mr. Canady, "Well, I was -- let me tell you something.  If he
put his hands on me, if he put his fucking hands on me, I'd
have to try to kill him right there."

       In another call that same day, he talks about having a
machete in his room, a bow and arrow, and a gun.  It goes on.
The recordings are for the Court.  He again singles out Miles
Davis.  Later says, "I oughta kill Miles because he's going to
kill me."  Mr. Canady, Page 5 of the Government's motion, "Damn
it.  I oughta kill him because he ought not to be on my goddamn
property with a fucking gun in my fucking face."  Remember, the
defendant has authorized in all of his crop insurance policies
the right of USDA-OIG agents to be there to inspect his crops
and review his record to ensure the integrity of the program
and that he's not committing fraud.

       Mr. Canady talks about the day that they executed the

1  search warrant, Page 6 of the Government's motion.  Mr. Canady

2  said, "But I'm gonna tell you.  I'm gonna tell you what.  That

3  morning, somebody -- I should have been dead.  I really, really

4  should have been dead because I would have never let nobody

5  just come in on my property like that.  I should have killed

6  the man driving that first car."

7        He goes on in the February 21, 2012 consensually

8  monitored call and he says to the cooperating witness, "Because

9  I'm gonna kill him if he ever comes back to my house again."

10  Cooperating witness says, "Well, you need to be careful.  Don't

11  do nothing you ain't going to be" -- Mr. Canady, "He's got to

12  kill me or I gotta kill him because I think he's coming to kill

13  me."  Cooperating witness, "Well" -- Mr. Canady, "Because he

14  ain't got no business on my goddamn property."

15        That is the nature and circumstances of this person,

16  how he speaks unguarded, the threats he has made to law

17  enforcement and Miles Davis, Special Agent Davis told you he

18  was concerned for his safety and that of his family.

19        With respect to whether or not the defendant poses a

20  serious risk of flight, the Government believes that the

21  defendant has concealed assets that he has hidden from this

22  Court on two separate occasions now.  The defendant submitted a

23  financial affidavit for court-appointed counsel in connection

24  with a 2010 target letter.  Upon information and belief, the

25  defendant declared his assets, declared his rental income to be

1   $1500 a month in that September 13, 2010 affidavit and listed

2   mobile homes valued at $80,000.  Forty-five days later, in

3   Government's Exhibit 4, which has been presented to the Court,

4   he lists 42 mobile homes as his assets.  He lists gross rental

5   incomes alone of nearly 192,000 and a total net worth of 1.7

6   million.  Four months later while he's enjoying the benefits of

7   court-appointed counsel, he gets another financial affidavit,

8   again declaring 42 mobile homes, as Government's Exhibit 5,

9   declares his total assets to be over 2.5 million and gross

10  rental income of $192,000.

11          In these Cape Fear Farm records, Your Honor, he tells

12  Cape Fear Farm that he collects this money in cash.  It's

13  mostly in cash, getting $400 a month for 42 mobile homes.

14  That's $20,000 a month.  In January of 2012, this year,

15  Government's Exhibit 6, he declares gross income from these

16  rental properties of $168,000 for last year alone, I guess up

17  until then.  Now maybe ten aren't rented.  So you negate, you

18  know, a fourth of that.  It still leaves $15,000 worth of cash

19  unaccounted for every month.  Bank records have been reviewed.

20  There are no significant cash deposits into the bank account

21  records.  There is some rental income declared.

22          So the Government doesn't know -- the Government does

23  not see in the information it has where this money is going.

24  The defendant has access to the money, has had access to it.

25  It's cash.  It's easily, it's easily concealed.  He has alleged

1  in the forfeiture provision to have, to have gained over a

2  million in criminal proceeds.

3       So the position of the Government is based upon all of

4  the charges he's facing and the severity of the offenses that

5  he's facing.  He poses a serious risk 'cause now he can flee

6  and we don't have any way to know where his assets are.  He's

7  concealed them from the Court.  Just last week, I understand,

8  he submitted a financial affidavit with the Court and it's my

9  understanding that that financial affidavit, as reflected in

10  the Pretrial Services report, he again lists his total assets

11  to be $265,000.  Exhibit 6, Your Honor, shows $2.8 million in

12  assets.  He lists rental income of only 100, $1500, again.

13  It's got, Exhibit 6, $168,000 in gross rental income.

14       So he's -- he's not -- and he chose not to provide his

15  financial information to Probation.  And it says in Employment

16  History, "Canady did not provide any information regarding his

17  annual earnings."  He -- the information that Probation has in

18  this report, Your Honor, is based on the affidavit he completed

19  last week and that affidavit, the Government believes, is false

20  based on what he has submitted to Cape Fear Farm Credit, but

21  what the Cape Fear Farm Credit reports, balance sheets, signed

22  under penalty of perjury show this Court is that the defendant

23  has assets.  He has the ability to flee.

24       What is also noted is that he doesn't have a passport,

25  yet he's been able to leave the country.  He's gone to the

1    Bahamas on two separate occasions.  So he's left the

2    Continental U.S. without a passport.  I'm not sure how he

3    managed that, but he can do it.

4          And again, going back to danger to the community,

5    you've heard the threats.  Here is a defendant, who, in

6    November of 2010, firearms were removed by law enforcement.  He

7    was not in any way dissuaded from keeping weapons.  He kept

8    that gun.  He kept that gun underneath his bed and it was found

9    when law enforcement executed the arrest last week, Your Honor.

10         So the Government submits to the Court based upon all

11   of these factors, all of these facts, that there is no

12   condition or combination of conditions which can assure the

13   safety of the community and others, as well as assure the,

14   ensure the appearance of the defendant.

15         One thing I did leave out is Special Agent Davis

16   interviewed one of the daughters.  The daughter says she's,

17   she's in fear of, for her life every day with the defendant.

18   There are other witnesses who have told the Government that

19   he's dangerous and you can see, you can evaluate his

20   dangerousness based upon his own words, the way he talks, what

21   he threatens to do, and his ability to do them, Your Honor.

22         And so the Government would submit that anything short

23   of incarceration, pre-trial detention would allow this

24   defendant to destroy, conceal, or otherwise obstruct the

25   criminal case.

1          THE COURT:  Thank you, ma'am.

2          Mr. Neyhart?

3          MR. NEYHART:  I'm not sure quite where to begin, but

4   initially, I'd like to clarify two things.  First, I believe

5   the probation officer will confirm that while Mr. Canady, I

6   believe, was starting in the process of, of an affidavit, when

7   it was realized that I was representing him on, on, basically,

8   the target letter, I believe no affidavit was completed or

9   submitted in 2012.  And, and I believe the information there

10  was not based on a fresh affidavit, but, but the original

11  affidavit in 2010.

12          THE COURT:  And let me just note for the record that

13  affidavit's at Docket Entry 2.

14          You may continue, sir.

15          MR. NEYHART:  The Government goes to a great length to

16  talk about Mr. Canady being a risk of flight and, and having

17  the opportunity to somehow impede or destroy evidence, although

18  I don't believe there's been any evidence of, of that going on.

19          And it -- if any defendant has ever had strong ties to

20  the community, it'd be Mr. Canady.  He's been there all his

21  life.  He's a prominent famer.  He's -- in fact, at -- at the

22  beginning -- when I was initially appointed on a target letter

23  I think he had something like 1500 acres under production.

24  Since then, you know, this has had a large negative impact on

25  his farming operations and I believe this year he's down to

1    500, but I don't know if you have any relatives who are

2    farmers, but he, he has crops in the ground.  He's got about

3    two-thirds of a bean crop planted and he's, if he's not able to

4    get back to his property, there will be a lot of economic waste

5    with respect to that and also, I believe, a tomato hothouse and

6    a pretty sizable watermelon patch.

7           But, you know, Mr. Canady got a target letter in 2010.

8    He didn't, he didn't take any steps then to flee.  He knew the

9    Federal Government was investigating.  We had, I think, the

10   total of either three meetings, one of which, the last of which

11   was with the prosecutor where he, he came to this building and

12   talked about his case and tried to present his, his view of

13   the, of the documents and figures and the firearms that the

14   Government was talking about.  He didn't flee after any of

15   those.  He didn't flee after the Government executed a search

16   warrant on his property and which would result in, you know,

17   another likely charge, which he has now been indicted for.  In

18   all that time he stayed where he was, kept farming.  Only, only

19   difference was he stopped using the, anything to do with the

20   Government and he's just farming his land straight up without

21   any insurance.

22          So to say Mr. Canady is a risk of flight, I think, is,

23   is, is stretching.  He, he personally has never, never tried to

24   do anything other than stay at his home where, very near where

25   his parents were.  He has very strong ties to the land and the

1  community and I don't, I don't believe it's fair to say that

2  he's a risk of flight.

3          THE COURT:  Well, the factors that -- and I haven't

4  resolved the issue in my mind -- but --

5          MR. NEYHART:  Right.

6          THE COURT:  -- I'm interested in your comments -- the

7  factors in the case, in this case that jump out --

8          MR. NEYHART:  Uh-huh.  (Indicating an affirmative

9  response)

10         THE COURT:  -- are that he's not a young man --

11         MR. NEYHART:  Uh-huh.  (Indicating an affirmative

12  response)

13         THE COURT:  -- and while he didn't flee after the

14  target letter, he hadn't been indicted --

15         MR. NEYHART:  Uh-huh.  (Indicating an affirmative

16  response)

17         THE COURT:  -- and he is now indicted and this is a

18  very substantial indictment --

19         MR. NEYHART:  Uh-huh.  (Indicating an affirmative

20  response)

21         THE COURT:  -- that carries a prison term, the maximum

22  terms -- and not, not, not addressing the issue of guidelines

23  and --

24         MR. NEYHART:  Right.

25         THE COURT:  -- or actual sentence -- but certainly the

1    maximum penalties could keep him in jail easily for the rest of
2    his life.
3              MR. NEYHART:  Right.  Well --
4              THE COURT:  And that combination of circumstances
5    gives anybody at least an incentive to flee.
6              MR. NEYHART:  Right.  I, I personally think
7    Mr. Canady's incentive is to try to, to clear his name, at
8    least, you know, his attitude towards me has, has been in that
9    direction.  And I don't -- and -- and he -- the fact that
10   he's --
11             THE COURT:  And I think some folks --
12             MR. NEYHART:  -- an older man kinda cuts both ways,
13   you know.  This is his, this is his home.  He's been there all
14   of his life and he's, you know, 60 plus years, you know,
15   attached to the ground in one area.  It's extremely hard work,
16   especially an older farmer, to, to give up.
17             So I, I would --
18             THE COURT:  I understand.
19             MR. NEYHART:  -- say that on the flight issue.
20             With respect to a danger to the community -- and I
21   would first like to convey at Mr. Canady's request his, his
22   apology to Agent Miles for the statements that are reflected
23   here in the Government's motion.  And I would respectfully
24   argue there's a difference between someone who's maybe been
25   drinking and running his mouth versus an intentional, direct

1  threat to a Government, to go after a Government agent.  And

2  even in the, you know, the statement with the language we have

3  here, it's all focused on someone coming on his property with

4  guns and I'd like to talk a little bit about the context of his

5  over-extreme reaction to that and, and these, these statements

6  here.

7          The area is not a safe area and Mr. Canady has also

8  had an experience with, I think, a fake SBI agent coming on

9  flashing a badge and, and then a little while later, something

10 was ripped off by the fake SBI agent and he's expressed that to

11 me.

12         The act of coming onto someone's land with guns drawn,

13 for him personally, is something he has a very extreme fear and

14 a violent -- I don't know if "reaction" is the right word --

15 but aversion to, is probably the better.  And that was

16 triggered in this case.  There's been -- even in his

17 statements, he doesn't talk about going out of his way to

18 impede or retaliate for an investigation.  And, you know, these

19 are very serious statements and I know the Court takes them

20 very seriously, but I don't think that in context -- first of

21 all, I don't think they -- because they were not intended to be

22 communicated to Mr., Mr. Davis -- I don't think they're actual,

23 you know, threats and I think it was more in the context of

24 someone who may have been drinking and running his mouth versus

25 someone who's actually going to make good on them.  And that

 1  would be Mr. Canady's position with respect to that.

 2          And, and again, he does not have, he does not have a

 3  record of selling drugs or other violent acts.  He's not been

 4  prosecuted for anything since 1997, which was the tragic

 5  accident with respect to his brother.

 6          So this is not a, as Your Honor pointed out, this is

 7  not a presumption case.  I do believe there is a combination of

 8  circumstances and, and conditions that would allow Mr. Canady

 9  to, to go home to take care of his business and come back and,

10  and address these charges.

11          And I think that with respect to the third-party

12  custodian, it was -- we weren't in our short time able to

13  identify another third-party custodian.  If that becomes the

14  issue, I, I'd respectfully request additional time to locate

15  another third-party custodian if you don't believe Mrs. Canady

16  is appropriate.

17          THE COURT:  Well, I intend to rule on the motion today

18  and the statute, of course, provides a mechanism if the Court

19  does not allow release for the defendant to seek a reopening of

20  the motion.

21          MR. NEYHART:  Uh-huh.  (Indicating an affirmative

22  response)

23          THE COURT:  Ms. Rangarajan, any closing thoughts?

24          MS. RANGARAJAN:  Your Honor, I just wanted to note for

25  the Court by way of proffer that when the officers went to

1 conduct the search warrant they were in marked patrol cars.

2 They all had their vests on. They had blue lights. I mean,

3 they were identified as federal law enforcement agencies. They

4 also had the local deputies with them.

5          So there was no doubt in anyone's mind and there

6 surely was no doubt in Mr. Canady's mind that it was law

7 enforcement that was approaching. The same thing when he was

8 arrested last week. They were in full gear, Your Honor. So to

9 say that he didn't know they were agents or didn't think they

10 were law enforcement, I don't think the facts of the arrest or

11 the warrant would support that.

12          THE COURT: Very good.

13          I'm going to take a few minutes to consider this

14 matter. We'll take a brief recess.

15          COURT SECURITY OFFICER: All rise. Court will be in a

16 brief recess.

17     (Recess from 2:17 p.m., until 2:37 p.m.)

18     (Call to Order of the Court)

19          THE COURT: Before I announce my ruling on the

20 detention motion, let me mention a couple of housekeeping

21 things.

22          I will schedule a hearing on the issue of whether the

23 defendant still qualifies for appointed counsel where we can

24 focus on that issue separately outside the context of another

25 pending motion.

1    So I'm very much aware of that issue and I will set,

2  enter an order setting a hearing on that issue.  Because I do

3  believe the record that's been developed so far does raise an

4  issue as to whether the defendant remains entitled, whether he

5  was ever entitled, frankly, to appointment of counsel.

6        MS. RANGARAJAN:  Your Honor, with respect to the, the

7  date that that is calendared for --

8        THE COURT:  Yes, ma'am.

9        MS. RANGARAJAN:  -- I will be out of the office

10 starting tomorrow through the morning of July 9th.

11       THE COURT:  Okay.

12       MS. RANGARAJAN:  Obviously, anyone in our office would

13 be prepared, but since I am intimately familiar with the facts

14 of this case I would prefer to be the one handling that

15 hearing, if at all possible, Your Honor.

16       THE COURT:  Well, Mr. Neyhart remains, until the Court

17 takes some action, Mr. Neyhart remains defendant's counsel.

18       So, Mr. Canady, that will not affect -- there'll be no

19 -- I, I intend there to be no gap in your having access to a

20 lawyer.  And I'm not trying to prejudge the outcome of, of that

21 issue, just I do want to assure you you're not going to have --

22 the Court will do everything to make sure there's no gap.  You

23 will not have a gap -- I can tell you that -- in your

24 representation.

25       So even if we accommodate Ms. Rangarajan's schedule --

1          And you're, you're returning?

2          MS. RANGARAJAN:  July 9th, Your Honor.

3          THE COURT:   July 9th, okay.

4          MS. RANGARAJAN:  So if it could be a day after that,

5    that would be great.

6          THE COURT:  I'll do my best to accommodate that.

7          Then there was some discussion of whether the

8    defendant completed an affidavit in connection with the

9    Pretrial Services report.  He, in fact, did.  I have it in

10   front of me.  I'm going to direct that it be filed with the

11   Court under seal.  And I, I don't know the ultimate disposition

12   of this document, but it is -- it is a document -- it is a

13   financial affidavit that was signed by the defendant.

14         So I think we need to preserve it as evidence for

15   whatever use there may be of it down the line.

16         Now with respect to the, the main issue before us

17   today, that is, the Government's motion for detention, I'm

18   going to be entering a written order on this, but I will take a

19   moment to announce my ruling here.

20         Based on the record that has been developed before me,

21   I believe the law requires me to allow the Government's motion.

22         I do so finding that the Government has shown by clear

23   and convincing evidence that there's no condition or

24   combination of conditions that will reasonably assure the

25   safety of any other person and the community and that by a

1    preponderance of the evidence there's no condition or

2    combination of conditions that will reasonably assure the

3    appearance of the defendant, as required.

4         Mr. Canady, my ruling does not affect the presumption

5    of innocence which you will continue to enjoy at the trial in

6    your case.

7         On a motion such as this, the Court is required to

8    consider certain sets of factors.  I have considered those

9    factors.

10        One is the weight of the evidence.  I believe the

11   Government has shown that it has a strong case against you.

12        I'm required to consider the nature and circumstances

13   of the offense.  This is an unusual case in which the, the

14   majority of the charges relate to what I would refer to as, I

15   think known in the vernacular, as white collar crimes.  While

16   those can be serious -- and I don't mean to minimize the danger

17   that they can present to the community -- typically, there's a

18   fairly high release rate in those types of cases.

19        What changes the circumstances here are, among other

20   things, primarily, the threats made to agents.  I've considered

21   the context in which those threats, I'm referring specifically

22   the initial threat that was made -- and I do consider it a

23   threat -- to, I believe it was Agent Moles, if I have his name

24   correct, Doles -- excuse me -- the statement that you were

25   going to go get your gun and then the threats made in the

1   recorded calls.

2          I've considered the, I've considered the arguments by

3   your counsel, ably presented, that the context of those calls

4   needs to be considered.  I've considered it.  The Court's not

5   willing to put agents in the position of potentially being

6   killed.  You possessed a firearm after several occasions,

7   multiple firearms, when you knew you were a prohibited person.

8   The law assumes you knew you're a prohibited person.

9   Authorities came and seized those guns and yet you continued to

10  possess a gun.  You met Agent Doles in the possession of a gun,

11  with the possession of a gun.

12         The fact that you made -- there's no evidence that you

13  were intoxicated during these calls, by the way.  But that's

14  really not much of a defense because you might be intoxicated

15  when agents happen to come on your property and your statements

16  indicate that they need to be fearful of their life if they

17  happen to come on your property.  It's natural for them to come

18  on your property with guns drawn, it would seem to me.  That's

19  not unreasonable under the circumstances in light of these

20  threats and I know of no condition that can address that,

21  frankly.  And it's a, it's a tragedy that a case like this

22  would take a turn of this character, but we are where we are

23  with it.

24         I have considered your prior felony conviction.

25  Obviously, not just the unlawful possession aspect of it, but

1  that, that does suggest a propensity towards violent conduct.

2  There's, there's other evidence of impulsive, violent conduct.

3  That, combined with abuse of alcohol, is a very dangerous

4  mixture, particularly when a lot of the, the hostility is

5  directed towards law enforcement.  It's a very dangerous

6  situation and I, I really know of no conditions that would

7  adequately control that.

8          I'm required to consider your history and

9  characteristics, sir.  I've touched on that, the manslaughter

10  conviction.

11          I've considered your tenure in the community.  All the

12  -- obviously, you've been a very productive member of the

13  community operating a very successful business, apparently.

14  I've considered all that, but these, these other factors for

15  the issue, the narrow issue that's before me, I believe

16  requires that you be held in custody.

17          I've touched on the nature and seriousness of the

18  danger posed by your release.  I think it would put law

19  enforcement, in particular, in grave danger.

20          The third-party custodianship, I really, is not

21  suitable.  The one that was proposed is not suitable.  I'm not

22  sure any -- any could be -- any would exist that would be

23  suitable, sufficient, that is, to address the risk that is

24  presented here.

25          As I say, I will be entering an written order.

1        Ms. Rangarajan, is there anything further at this time

2   on behalf of the Government?

3        MS. RANGARAJAN:  Nothing further from the Government,

4   Your Honor.

5        THE COURT:  Mr. Neyhart, sir, anything further on

6   behalf of your client at this time?

7        MR. NEYHART:  Nothing at this time, Your Honor.

8        THE COURT:  Very good.  Thank you, sir.

9        I remand the defendant to the custody of the Marshal.

10        We'll be in recess.

11        COURT SECURITY OFFICER:  All rise.  This Honorable

12   Court will be in recess.

13      (Proceedings concluded at 2:45 p.m.)

14

15

16

17                          CERTIFICATE

18        I, court approved transcriber, certify that the

19   foregoing is a correct transcript from the official electronic

20   sound recording of the proceedings in the above-entitled

21   matter.

22   /s/ *Janice Russell*                        July 26, 2012

23   Janice Russell, Transcriber                    Date

24

25